**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| BRO-TECH CORPORATION<br>t/a THE PUROLITE COMPANY, et al., | : | |
| | : | |
| Plaintiffs, | : | Civil Action No. 05-CV-2330 |
| | : | |
| v. | : | |
| | : | |
| THERMAX, INC. d/b/a THERMAX<br>USA LTD., et al., | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM AND ORDER OF SPECIAL E-DISCOVERY MASTER**

**I.      Procedural Background**

This follows up the Memorandum and Order dated July 29, 2008 (the "July 29 Order"), that left open the treatment of non-indexable image or picture files as part of the activities before the undersigned. The July 29 Order sets forth a detailed background of these matters and certain defined terms from the July 29 Order are referred to in this Memorandum and Order.

After the July 29 Order was issued, two additional conferences were held before the undersigned on July 29, 2008 and August 8, 2008. (Both of these conferences were transcribed, and copies of the transcripts are included in the Master's Packet II[1] as Exhibits 72 and 84.) Pursuant to the request of the undersigned, the parties' experts also held several "meet and confer" sessions without counsel, to address technical issues

---

[1]      A packet of written correspondence between the parties and the undersigned, as well as the parties themselves, and the transcripts of conferences that were held before the undersigned concerning these matters since the July 29 Order was issued, consisting of Exhibits 72 – 104, is being filed with the Clerk contemporaneously with this Memorandum and Order. Exhibits from this material are hereinafter referred to as "*Master's Packet II*, Exhibit X."

surrounding the image files.  Moreover, the parties submitted multiple written submissions to the undersigned concerning the image files. (Copies of all written submissions by the parties are also included in the Master's Packet II.)

Unlike the Joint Protocol issues, where the parties, with help from their experts, were able to reach agreement, no such agreements were reached on a protocol for reviewing the image files.  Accordingly, this Memorandum and Order resolves that issue,[2] and addresses some other administrative issues raised during the most recent proceedings.

## II.    Additional Factual Background

As noted on page 26 of the July 29 Order, on July 24, 2008, Plaintiffs' e-discovery expert produced a summary analysis of the image files from the India and Michigan Images in accordance with the Exceptions Process mandated in paragraph 4 of the Joint Protocol.  That report contained a total of 37,946 files. *Master's Packet II, Exhibit 84* (August 8, 2008 Transcript of Conference, p. 13).  After de-duping those files, the universe of image files was reduced to 10,310.  *Master's Packet II*, Exhibit 84 (August 8, 2008 Transcript of Conference, p. 14).

Furthermore, after a comparison of hash values from the NIST list of standard system files is performed, an additional 172 files can be removed from the universe of 10,310 image files, leaving a total of 10,138 unique image files that may contain user-created files (the "10,138 Unique Images"). *Master's Packet II*, Exhibit 84 (August 8, 2008 Transcript of Conference, pp. 8 – 9; 18 – 19).

_____

[2]    I offered the parties the option of issuing a short form or long form order on the image file issues. *See Master's Packet II*, Exhibits 85 (August 8, 2008 Letter from P. Weiner) and 84 (August 8, 2008 Transcript of Conference, pp. 62 - 64).  As was their right, Defendants requested that I issue this Memorandum and Order, rather than a short form order. *See Master's Packet II*, Exhibit 86.

From this subset of 10,138 Unique Images, 342 of the images are .tif files that are capable of further refinement using optical character recognition ("OCR"),[3] which would allow them to be searched using the Plaintiffs' 340 Search Term List and the Privilege Search Terms. *Master's Packet II*, Exhibit 84 (August 8, 2008 Transcript of Conference, pp. 9 – 10; 53).

In addition to the 10,138 Unique Images:

- another 1,276 image files were attached to e-mails that were identified using Plaintiffs' 340 Search Term List; and

- an additional 370 image files were attached to e-mails that were identified using the Privilege Search Terms.

*Master's Packet II*, Exhibit 84 (August 8, 2008 Transcript of Conference, pp. 17 - 18).

## III.   The Parties' Positions On The Non-Indexable Image Files

### A.   Defendants

Defendants claim that Plaintiffs do not have the right to review everything on the India and Michigan images (or else there would be no need for the appointment of the undersigned), and that the image files from the Exception Report are "the analogous of everything when it comes to the images." *Master's Packet II*, Exhibit 84 (August 8, 2008 Transcript of Conference, p. 20).  Based on this premise, Defendants argue that Plaintiffs must provide "some rationale, by file name, hash value, or search term, that the documents at issue were not Thermax's own documents, but Purolite's," *see Master's Packet II*, Exhibit 89 (August 13, 2008 letter from D. Zaslowsky, p. 2 - 3), consistent with the Trial Judge's directive against "full disclosure" of the India and Michigan

---

[3]     Optical character recognition, usually abbreviated to OCR, is the mechanical or electronic translation of images of handwritten, typewritten or printed text (usually captured by a scanner) into machine-editable/searchable text.

Images in the March 17 Order.  For this reason, Defendants believe that the *only* images that should be reviewed as part of this exercise are those 1,276 image files attached to e-mails that were identified using Plaintiffs' 340 Search Term List.  *See Master's Packet II*, Exhibit 84 (August 8, 2008 Transcript of Conference, p. 27) and 89 (August 13, 2008 Letter from D. Zaslowsky, p. 2).  Even with respect to those 1,276 image files, during a hearing Defendants proposed that another criteria be added to the parties' agreed-upon protocol for reviewing those documents and data, that being, if the e-mail that contained a "hit" for one of Plaintiffs' 340 Search Term List relates to the Thermax Defendants' resin business then Plaintiffs can look at the image attachment; however, if the e-mail does not relate to the Thermax Defendants' resin business, then Plaintiffs should not be allowed to look at the image attachment.  *See Master's Packet II*, Exhibit 84 (August 8, 2008 Transcript of Conference, pp. 20 – 21).

Alternatively, Defendants claim that the 10,138 Unique Images should be culled or reduced by:

- certain file types (*i.e.*, excluding all BMP,[4] GIF[5] and PNG[6] files;

- file size (*i.e.*, excluding any file that is equal to or less than 20 kilobytes in size); and

---

[4]      "BMP" (short for bitmap) is a graphic format used internally by the Microsoft Windows graphics subsystem, and used commonly as a simple graphics file format on that platform. BMP files are usually not compressed, so they are typically much larger than compressed image file formats such as JPEG or PNG. The simplicity of BMP and its widespread use in Microsoft Windows and elsewhere, as well as the fact that this format is well-documented and free of patents, makes it a very common format.
[5]      "GIF" (short for Graphics Interchange Format) is a bitmap image format for pictures with up to 256 distinct colors.  The format was introduced by CompuServe in 1987 and has since come into widespread usage on the World Wide Web.  GIFs are compressed files, and were adopted to reduce the amount of time it takes to transfer images over a network connection.  Until the year 2004, this was covered by a patent owned by Unisys.  The desire for a comparable format with fewer legal restrictions led to the development of the PNG (Portable Network Graphics) standard.
[6]      "PNG" (short for Portable Network Graphics") was created as a more powerful alternative to the GIF file format because of the Unisys Patent on the GIF format.  PNGs are not restricted to the 256 color limitation of GIF files, support better transparency options and have better compression, but do not support the multiple frames and simple animation that GIF files have.

- file path[7] (*i.e.*, eliminating any file that contains the terms "temp," "java," "\Windows", "\Program Files" and "\Application Data" in their path, or that contain the terms "\rpdixit" in the file path).[8]

*See Master's Packet II*, Exhibits 84 (August 8, 2008 Transcript of Conference, p. 22 - 28), 76 (August 7, 2008 e-mail from D. Zaslowsky, and attachment thereto); 89 (August 13, 2008 letter from D. Zaslowsky, pp. 3 – 4); and 97 (August 18, 2008 letter from D. Zaslowsky, p. 1). Defendants estimate that this additional culling will reduce the total population of image files to approximately 1,400 image files. *Id.*

Defendants also note that because the image files cannot be indexed or searched electronically, before *any* of the images are shown to Plaintiffs, Defendants will have to conduct a "page-by-page" privilege review of the image files. *See Master's Packet II*, Exhibit 84 (August 8, 2008 Transcript of Conference, pp. 24; 28 - 29). Stated another way, because the image files are not capable of being indexed or searched electronically, for this subset data, Defendants cannot agree to the protocol set forth in the Clawback Agreement that provided Plaintiffs with immediate access to documents that contained "hits" for one of the terms on Plaintiffs' 340 Search Term List, after presumptively privileged documents were removed from that subset of data and excluded from review by either party via an automated, "bulk-tag" search using The Privileged Search Terms.

However, Defendants do not object to the use of OCR technology to run search terms on images that can be OCR'd, with the resultant documents being reviewed

---

[7] A path is the general form of a file or directory name, giving a file's name and its unique location in a file system. Paths point to their location using a string of characters signifying directories, each path component separated by a delimiting character, most commonly the slash character ("/"), backslash character ("\"), or colon (":"), though some operating systems may use a different delimiter.

[8] Rajesh Dixit is the service manger for Thermax's Absorption Chiller Division, which, according to Defendants, has "absolutely no connection with the resin business that is the subject of this litigation." Images that come from the files of Mr. Dixit, according to Defendants, have "\rpdixit" and/or Mr. Dixit's name in the file path. *See Master's Packet II*, Exhibits 89 and 97.

pursuant to the parties' Clawback Agreement (*i.e.*, documents with hits from the

Plaintiffs' 340 Search Term List would immediately be turned over to Plaintiffs for

review and those documents within that subset with a hit from the Privilege Search Term

List would be excluded from review). *See Master's Packet II*, 89 (August 13, 2008

Letter from D. Zaslowsky, p. 3).

Defendants also:

- object to the fact that the 1,276 image files that were attached to

  documents with keyword hits from Plaintiffs' 340 Search Term List have

  already been loaded into the review environment by Plaintiffs' e-discovery

  expert,[9] and thus, were available to Plaintiffs' counsel for immediate

  review, noting that the Joint Protocol specifically excepted image files

  from review until the parties could either reach an agreement on a protocol

  for their review, or have the undersigned resolve the issues of a protocol

  for reviewing the image files. *See Master's Packet II*, Exhibits 89 (August

  13, 2008 Letter from D. Zaslowsky, pp. 1- 2); 97 (August 18, 2008 Letter

  from D. Zaslowsky, p. 2, *citing* ¶ 2.c.i.4.b of the Joint Protocol); and 84

  (August 8, 2008 Transcript of Conference, p. 36 ("The e-mail, the

  underlying document is part of the review.  What we're talking about now

  is whether the images should also be part of the [review]");

- because of various "mistakes" that were made by Plaintiffs' expert with

  respect to following the directives of the undersigned about what data

  should be processed and loaded into the review environment, *see e.g.*,

---

[9]       In a letter dated August 13, 2008, Defendants noted that following the August 8, 2008 conference
where this issue was first identified, Defendants "confirmed that, in fact, these images were among the
49,426 documents which FTI has provided for counsel's review." *See Master's Packet II*, Exhibit 89, p. 2.

*Master's Packet II*, Exhibit 97 (August 18, 2008 Letter from D.

Zaslowsky, pp. 1 – 2, detailing such "mistakes"), request an "order calling

for [Plaintiff's e-discovery] expert to confirm immediately that the review

environment does not (and will not) contain the 370 image files attached

to presumptively privileged documents." *See Master's Packet II*, Exhibit

89 (August 13, 2008 Letter from D. Zaslowsky, p. 2); and

- request clarification/amplification of paragraph 7 of the July 29 Order:

  (a) to make clear that Plaintiffs must specifically identify what

  documents, if any, they claim demonstrate non-compliance

  with the Stipulated Order and the September 30 Order, so it

  is likewise clear that the written certification concerning the

  destruction of non-responsive documents and data required

  by paragraph 7 of the July 29 Order covers all other

  documents and data. *See Master's Packet II*, Exhibits 74

  (August 7, 2008 e-mail from D. Zaslowsky) and 84 (August

  8, 2008 Transcript of Conference, p. 64 - 71); and

  (b) to provide a date by which Plaintiffs shall identify such

  documents and data, so any disputes concerning the

  "responsiveness" of specific documents and/or data can be

  raised with the undersigned in accordance with the mandates

  of the July 29 Order,[10] before the September 17, 2008

---

[10] The July 29 Order provides, *inter alia*:

Any disputes concerning the responsiveness of specific documents and/or data
shall promptly be raised with the undersigned.

deadline established by paragraph 7 of the July 29 Order.
*See Master's Packet II*, Exhibits 98 (August 20, 2008 e-mail
from D. Zaslowsky).

**B.     Plaintiffs**

Plaintiffs claim that because there are no technical tools available to effectively
determine whether a non-indexable image file is likely to contain Purolite information
(unlike documents and data that contain text that were capable of automated searches,
including keyword searches), an individual review of all of the image files (after
deduplication) is required, particularly in light of the Court's prior directive of ensuring
that Defendants have not retained Plaintiffs' information in contravention of the Court's
prior Orders. *See Master's Packet II*, Exhibits 88 (August 13, 2008 Letter from J.
McGovern, pp. 1 – 2) and 84 (August 8, 2008 Transcript of Conference, pp. 5 - 11).

Plaintiffs, however, are willing to exclude the following categories of image files
from review:

- the image files that were attached to e-mails that were identified using the
  Privilege Search Terms;

- files with MD5 hash values matching those on the NIST list of standard
  system files; and

- .tif files that are capable of being OCR'd, and searched using the
  Plaintiffs' 340 Search Term List and which do not result in a keyword
  "hit" (with those that do result in a "hit" being reviewed in accordance
  with the procedures set forth in the parties' Clawback Agreement).

*See Master's Packet II*, Exhibit 88 (August 13, 2008 Letter from J. McGovern, p. 2)

Plaintiffs, however, object to the additional criteria/methods proposed by
Defendants for further culling the 10,138 Unique Images for the following reasons:

- **File types**: Plaintiffs' employees utilize file types like bitmaps (.bmp) in
  their normal course of business for storing and transferring information,
  including plant photographs, images of documents and other images.
  Thus, excluding the file types requested by Defendants might omit images
  that display Plaintiffs' plant setups and other confidential information of
  Plaintiffs.

- **File size**: Plaintiffs' expert stated that meaningful data could be contained
  within documents from 5 to 20 kilobytes in size, thus, excluding files less
  than 20 kilobytes in size risks missing files that could contain Plaintiffs'
  information. (However, Plaintiffs' expert did note that "the likelihood of
  something – some meaningful information being stored in an image-type
  file that is less than five kilobytes is remote."); and

- **File Path**: Users have control over where they place files on their
  computer, including the ability to place documents in a temporary file
  folder, which would result in a file with a path name that would include
  "TEMP" or "JAVA."  Indeed, not only is placing a document in a
  temporary folder something a user who was trying to hide files might do,
  but a document could also be placed in a temporary folder when an
  attachment is opened from an e-mail, without any type of nefarious
  behavior by the user.  Thus, it is not possible to rule out with 100%

certainty based solely upon a document's "path" that files residing in the

specific directories that Defendants want to exclude would not contain

Plaintiffs' confidential information.

*See Master's Packet II*, Exhibits 88 (August 13, 2008 Letter from J. McGovern) and 84

(August 8, 2008 Transcript of Conference, pp. 41 – 43; 45 – 47; 49 – 52).

Plaintiffs also note that Defendants' e-discovery expert stated on the record that

the culling criteria/techniques proposed by Defendants do not provide 100% certainty

that a document or data that contains Plaintiffs' information would not get removed via

the proposed criteria/techniques, *see Master's Packet II*, Exhibit 84 (August 8, 2008

Transcript of Conference, pp. 44 – 45), which would defeat the entire purpose of this

exercise.

Plaintiffs also:

- object to the characterization that they or their e-discovery expert

  intentionally did anything improper when the 1,276 image files that were

  attached to documents with keyword hits from Plaintiffs' 340 Search Term

  List were placed into the review environment and made available to

  Plaintiffs' counsel for immediate review (arguing that the July 29 Order

  contained a chart identifying 49,926 "Documents with Hits, including

  Sources/Attachments" that were to be turned over to Plaintiffs as the

  Production Set, and the 1,276 files and their image file attachments were

  contained within this universe of data, thus, Plaintiffs' expert "had

proceeded in good faith to interpret the Order and Protocol[11] and
discharge[] its duties thereunder.")  *See Master's Packet II*, Exhibits 95
(August 15, 2008 Letter from J. McGovern) and 84 (August 8, 2008
Transcript of Conference, pp. 35 - 36);[12]

- do not object to specifically identifying in writing what documents they
  claim demonstrate non-compliance with the Court's prior Orders, so there
  is no confusion over what documents and data will and will not be
  destroyed in accordance with paragraph 7 of the July 29 Order. *See
  Master's Packet II*, Exhibit 84 (August 8, 2008 Transcript of Conference,
  pp. 70 – 71); and

---

[11]     The careful phrasing chosen by Plaintiffs seems to imply that the task of interpreting the Order
and Protocol were handled by Plaintiffs' expert – not counsel.  This implication is buttressed by Plaintiffs'
expert's statements on the record during the August 8, 2008 Conference. *See Master's Packet II*, Exhibit
84 (August 8, 2008 Transcript of Conference, pp. 35 – 36) ("Master Weiner, I don't mean to interrupt, this
is Rob DeCicco, but I think we are discussing something that is covered in the protocol in terms of the
attachments because the protocol indicates that it is keyword hit documents with their attachments. So I
just – I don't think we should continue to discuss this because I believe it is covered.")  While I agree there
is ambiguity in the terms of the Memorandum and Order that could cause confusion as to whether the 1,276
e-mails that had image file attachments should have been loaded with their image attachments, or only the
1,276 e-mails without the image file attachments should have been loaded, the task of interpreting the
Order and Protocol falls squarely on counsel.

[12]     After this issue came to light on August 8, 2008, at the direction of Plaintiffs' counsel, the 1,276
image files were eventually removed from the review environment by Plaintiffs' expert some time around
August 15, 2008. *See Master's Packet II*, Exhibit 95 (August 15, 2008 Letter from J. McGovern, and letter
attached thereto from Plaintiffs' expert.)  Notably, nowhere in Plaintiffs' submissions on this issue is there
a statement that Plaintiffs had not reviewed, or stopped reviewing, any of the image files that were attached
to the 1,276 e-mails before Plaintiffs' expert eventually removed such image files from the review
environment, including during the time between August 8, 2008 (when this issue was first addressed on the
record during a conference) and August 15, 2008 (when Plaintiffs' expert submitted a letter stating "as of
now" such image files had been removed from the review environment, but not stating the date when this
occurred), or at any time prior to when the images were loaded into the review environment.

- requested that it have until August 29, 2008 to complete its review of The Production Set.[13] *See Master's Packet II*, Exhibit 96 (August 15, 2008 Letter from J. McGovern).

## IV.    Order

### A.    What Will Be Reviewed

While I agree that Plaintiffs do not have the right to review everything contained on the India and Michigan Images, I disagree with Defendants' contention that the 37,946 image files identified in the summary report are "the analogous of everything when it comes to the images." To the contrary, the parties, with the assistance of the undersigned, have already undertaken significant efforts to reduce both the volume and types of data from the India and Michigan Images that has to be reviewed and to ensure that Plaintiffs have access to targeted documents and data from the India and Michigan Images. In fact, the total data set has been reduced from what the Defendants themselves estimated as "approximately 500 gigabytes of information – over a million user and system files and potentially hundreds of millions of printed pages,"[14] to less than the 50,000 documents and their attachments contained in the Production Set, and 37,946 total images (which have been further reduced to less than 11,800 total images[15].) This process was extensive and included:

---

[13]    While the July 29 Order did not set a deadline for Defendants' review of The Production Set, it did specifically reference Defendants' estimate on the record during a July 29, 2008 conference that it would take them two weeks (or until about mid-August 2008) to review this data. *See* July 29 Order, p. 14 and *Masters Packet*, Exhibit 64 (July 21, 2008 Transcript of Conference, p. 27.)

[14]    *See Master's Packet*, Exhibit 21 (June 12, 2008 Letter from D. Zaslowsky, p. 3)

[15]    This consists of: the 10,138 Unique Images; *plus* the 1,276 image files attached to e-mails that were identified using Plaintiffs' 340 Search Term List; *plus* the 370 image files attached to e-mails that were identified using the Privilege Search Terms.

- eliminating from both processing and review multiple categories of non-user operating or system files;[16]

- the use of a "smart" search engine to further eliminate from review binary information that is contained within user files;[17]

- an exception procedure that culminated in a 15 page report of various file types and over 260,000 files[18] – all of which the parties ultimately agreed could be eliminated from processing and reviewed as part of this exercise; and

- the use of a search term methodology for further reducing the volume of data that had to be reviewed, including via the summary elimination of documents and data that contained presumptively privileged search terms.

Thus, the fact that all that remains for potential review from the total universe of data on the India and Michigan Images is a discrete category of data (images) that totals less than 11,800 files is consistent with not allowing Plaintiffs to review "everything on the India and Michigan Images," even if the data set of images was not reduced any further.

Moreover, a key premise of Defendants' argument – that Plaintiffs must provide "some rationale, by file name, hash value, or search term, that the documents at issue were not Thermax's own documents, but Purolite's" as a threshold to reviewing a document – ignores the fact that because the image files are not capable of being indexed and do not contain machine-editable/searchable text, it is not possible to automatically search these documents by using automated technology or search techniques (*e.g.*, a

---

[16]   *See Master's Packet*, Exhibit 42 (Joint Protocol).
[17]   *See Master's Packet*, Exhibit 42 (Joint Protocol).
[18]   *See Master's Packet*, Exhibit 51(A).

search term methodology).[19]  Stated another way, with this discrete category of documents/data that cannot be further culled, the only way to determine whether they contain Plaintiffs' confidential information (which is the purpose of this exercise) is to review them individually.

Defendants' key argument also gives short shrift to the fact that the parties have already made liberal use of automated technologies to locate and isolate for stand-alone consideration this targeted set of data consisting of a single category of files (images), from the massive amount of total data contained in the India and Michigan Images, as noted above.  Furthermore, this argument also ignores the fact that the review of the India and Michigan Images is a remedial exercise and not in the nature of general discovery. *See* July 29 Order, p. 15.  Thus, the onus should be on the Defendants to demonstrate that there is no Purolite information within this discrete category of documents and data that are not capable of being searched automatically/without a page-by-page review, as opposed to Plaintiffs providing a rationale for reviewing particular documents within the data set even though Plaintiffs have never had access to it and there is no method for conducting a threshold or preliminary review of it.  Apportioning the burden for this discrete set of data in this fashion is also consistent with the Trial Judge's mandate requiring "a significant measure of disclosure of the contents of the India and Michigan servers . . . to ensure that Thermax has not retained Purolite information in violation of the May 23, 2003 Order." *See* July 29 Order, p. 14 (*citing* March 17 Order).

---

[19]       Indeed, this is the exact reason Defendants argue they are entitled to a "page-by-page" privilege review of all of the image files. *See Master's Packet II*, Exhibit 84 (August 8, 2008 Transcript of Conference, p. 24) ("[W]e're going to have the issue of the privilege.  [The image files] are going to have to be reviewed before they are shown to [Plaintiffs' lawyers], ever single one, page by page, for privilege because there is no way to do the type of a computer search that we did the first time as part of the clawback agreement.");

Having said that, there are still ways to further reduce the data set.  In particular,

- Both parties agree that the 37,946 image files can be deduped, which reduces the total volume of image files by more than two thirds;

- Both parties agree that a comparison of hash values from the NIST list of standard system files should be performed, which further reduces the total volume of image files, and eliminates 172 additional files;

- Both parties agree that the 370 image files that were attached to e-mails that were identified using the Privilege Search Terms can be excluded from review;

- Both parties agree that for those image files that can be successfully OCR'd, the protocol that was followed for the creation and review of the Production Set shall be followed, namely:  (i) in accordance with the Joint Protocol, Plaintiffs' expert shall prepare a "hit list" report using the Plaintiffs' 340 Search Term List;  (ii) the responsive data from the "hit list" shall be grouped into a sub-set (in accordance with Paragraph 3(d) of the Joint Protocol), and Plaintiffs' expert shall run the search terms from the Privilege Search Term List against that sub-set of data;  (iii) Plaintiffs shall be given immediate access to the documents and data that returned "hits" from the Plaintiffs' 340 Search Term List, minus any documents or data that have been identified as "hits" using the Privilege Search Terms (hereinafter "The Supplemental Production Set"); and (iv) the review of the Supplemental Production Set shall be conducted in accordance with the Clawback Agreement; and

- There was testimony presented that "the likelihood of something – some meaningful information being stored in an image-type file that is less than five kilobytes is remote," which I found credible. *See Master's Packet II,* Exhibit 84 (August 8, 2008 Transcript of Conference, pp. 45 – 47). There was also testimony presented indicating that using 20 kilobytes as a file size cut off point is "somewhat arbitrary," and that meaningful information could be put into an image file of between five and ten kilobytes, which was not rebutted in any fashion. *Id.* Thus, any files that are less than five kilobytes in size shall be excluded from the review set.[20]

Accordingly, the following image files will be reviewed by the parties (collectively the "Image File Review Set"), in accordance with the protocol set forth in section B below:

- the 10,138 Unique Images; *plus*

---

[20]     There is no record evidence to support the use of the other culling criteria/techniques proposed by Defendants, to which the Plaintiffs object. *See Master's Packet II,* Exhibit 84 (August 8, 2008 Transcript of Conference, pp. 7 – 8) ("And so our view is, the Plaintiff's view, that if we can use either a technique that is based on the knowledge, skill and experience of our experts or one of these more technical let-the-machine-do-the-work, so to speak, to reduce the file population by eliminating those files that the experts can tell us with a very high degree of confidence, 95 percent confidence, for example, do not contain Purolite information then I'm 100 percent for it. ... If, on the other hand, one of these techniques, whether it be the qualitative or a machine driven technique, wouldn't permit our expert to say in his professional opinion that he's highly confident that we are not going to miss any relevant document by using that technique, then I simply on behalf of the Plaintiff can't agree to it and we would be remitted to opening the files by hand."). While 100% certainty is not required, there was no testimony or evidence presented by the Defendants or their expert to demonstrate that culling the 10,138 Unique Images by the criteria/methods proposed by Defendants (*i.e.,* file path, certain file types and/or files that are equal to or less than 20 kilobytes) would not eliminate documents or data that may contain Purolite confidential information, to a reasonably degree of professional certainty, or otherwise. To the contrary, the only testimony presented by Defendants on this issue seems to imply that such certainty cannot be guaranteed using these techniques. *See Master's Packet II,* Exhibit 84 (August 8, 2008 Transcript of Conference, pp. 44 – 45). Given that the entire purpose of this exercise is to locate such documents and data if they exist on the India and Michigan Images, I cannot order the use of such culling criteria/techniques based upon the record presented.

- the 1,276 image files that were contained within the original Production Set/that were attached to e-mails identified using Plaintiffs' 340 Search Term List; *minus*

- any image file that is less than 5 kilobytes in size; *minus*

- any image file that can be successfully OCR'd.

**B.      The Image Review Protocol**

The review of the Image File Review Set also raises unique privilege issues.  It is precisely because the image files are not capable of being searched in an automatic fashion that Defendants are entitled to a "page-by-page" privilege review of this category of data.  As noted in the July 29 Order, Defendants have the right to conduct a full privilege review on their data, and Plaintiffs have provided no authority, and the undersigned has not located any independently, that would support ordering Defendants to forgo a privilege review of any of their data under the circumstances presented here. *See* July 29 Order, pp. 17 – 19.  Thus, while Defendants voluntarily agreed that the procedures set forth in the Clawback Agreement would govern the review of documents and data in the Production Set (including removing presumptively privileged documents and data that were identified as "hits" after performing an automated-"bulk tag" search using the Privilege Search Terms, and then turning the remainder of the scrubbed data over to Plaintiffs for review with clawback rights), Defendants also have the right to choose not to voluntarily agree to use a non-waiver agreement/the procedures set forth in the Clawback Agreement for the review of the image files.  And that is how Defendants indicated they want to proceed here.

Accordingly, the Image File Review Set will be reviewed as follows (consistent with the procedures mandated by the Trial Judge in the March 17 Order):

- Plaintiffs' expert shall prepare the Image File Review Set, and produce the Image File Review Set to Defendants' counsel;

- Defendants shall conduct a privilege review of the Image File Review Set; [21]

- Defendants will provide all such documents from the Image File Review Set which are not privileged to Plaintiffs' counsel, on an AEO basis, and a privilege log for any withheld or redacted documents;

- Plaintiffs' counsel will conduct a review of the non-privileged documents from the Image File Review Set, and provide Defendants' counsel with a list of image files that Plaintiffs claim are "responsive" (as defined by the July 29 Order); and

- All remaining non-responsive image files from the Image File Review Set will be destroyed following the procedure mandated by paragraph 7 of the July 29 Order.

## C.    Other Issues

Defendants originally requested a clarification to paragraph 7 of the July 29 Order which required Plaintiffs to specifically identify what documents they claim are "responsive," so it is clear that all other "non-responsive" data will be destroyed.

---

[21]    Defendants represented on the record that they have been reviewing the Production Set at a rate of one thousand documents/per person day, and they could conduct a review of the relevant image files in 10 – 12 days. *See Masters' Packet II*, Exhibit 84 (August 8, 2008 Transcript of Conference, pp. 33, 55 – 56). Defendants can still agree to consent to the use of the procedures set forth in the Clawback Agreement for the review of the Imaged File Review Set, which would allow the Imaged File Review Set to be turned over to Defendants immediately.

Plaintiffs stated during a conference they did not object to such a clarification, and in a recent e-mail also specifically requested that the clarification be part of this Order. *See Master's Packet II*, Exhibit 100 (August 22, 2008 e-mail from J. McGovern). Thus, the Order that accompanies this opinion addresses this issue.

Defendants do not object to Plaintiffs' request to expand the two week time period Plaintiffs originally proposed for reviewing the Production Set until August 29, 2008. *See Master's Packet II*, Exhibit 98 (August 20, 2008 e-mail from David Zaslowsky). Thus, that will be the deadline for Plaintiffs' counsel to review the Production Set and identify what documents and data Plaintiffs' claim are "responsive" (as that term is defined by the plain mandates of the Stipulated Order and the September 30 Order, as noted on pages 24 and 25 of the July 29 Order), so the Defendants have adequate time to address disputes, if any, concerning this issue, before the September 17, 2008 deadline.[22]

I also agree with Defendants' concern over mistakes that have been made by Plaintiffs' expert in following the mandates of certain directives of the undersigned, especially because it appears that Plaintiffs' counsel may have delegated the interpretation of certain issues to their expert. While I do not find that any of this conduct

---

[22]    Plaintiffs have raised the issue of whether they can also identify and not destroy documents/data that fall outside the scope of the July 29 Order – indeed, an entirely different category of documents/data altogether, comprising documents that were ostensibly requested by Plaintiffs in discovery, but were not produced by Thermax. *See Master's Packet II*, Exhibits 101 (August 22, 2008 letter from J. McGovern) and 102 (August 22, 2008 e-mail from J. McGovern). Despite noting this issue on the record during the August 8, 2008 conference, serving a written submission to the undersigned on August 13, 2008 (*see Master's Packet II*, Exhibit 88), and requesting and being given the opportunity to submit a reply written submission to the undersigned on August 15, 2008 (*see Master's Packet II* , Exhibits 90 – 95), Plaintiffs did not formally raise the issue of identifying and not destroying this whole other category of documents that fall outside the parameters of the July 29 Order until an after-hours letter was hand-delivered to the undersigned on the evening of August 22, 2008. *See Master's Packet II*, Exhibit 101. Given the upcoming September 17, 2008 deadline, and the need to establish a protocol for the review of the image files so they can be addressed as part of this process, this newly raised issue will have to be addressed independently from this Memorandum and Order.

was intentional, it is fair to have Plaintiffs' expert submit a declaration certifying that at no time have the following documents/data been included in the review environment, and that Plaintiffs' counsel have not otherwise been given access to such documents/data:

- any documents or data that were identified as "hits" using the Privilege Search Terms; and

- the 370 image files that were attached to e-mails identified using the Privilege Search Terms.

Finally, because of the September 17, 2008 deadline for completing discovery related to the issues before the undersigned [Docket No. 402], the time periods established by the accompanying Order include weekends and holidays, and provide for a "rolling" production, review and identification of applicable documents and data, as well as an opportunity for the parties to jointly raise the issue of an extension of the September 17, 2008 deadline with respect to the Image File Review Set or the Supplemental Production Set, should that be necessary.

An appropriate Order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| BRO-TECH CORPORATION<br>t/a THE PUROLITE COMPANY, et al., :<br>:<br>Plaintiffs, :<br>:<br>v. :<br>:<br>THERMAX, INC. d/b/a THERMAX<br>USA LTD., et al., :<br>:<br>Defendant. : | Civil Action No. 05-CV-2330 |

**ORDER OF SPECIAL E-DISCOVERY MASTER**

**AND NOW**, this 27th day of August, 2008, for the reasons contained in the attached Memorandum, it is hereby **ORDERED** that:

1.      Within two (2) days from the date of this Order (August 29, 2008), Plaintiffs' expert shall turn over to Defendants the Image File Review Set, in native format via a Summation load file.

2.      Defendants' counsel shall have a total of twelve (12) days from the date they receive the Image File Review set (or until September 10, 2008) to conduct a privilege review of the Image File Review Set, however, Defendants' counsel shall also meet the schedule set forth in number 3 below.

3.      Defendants' counsel will provide all such documents and data from the Image File Review Set that are not privileged to Plaintiffs' counsel, on an AEO basis, as follows:

- ½ of the Image File Review Set shall be provided to Plaintiffs' counsel within six (6) days from the date Defendants' counsel receive the Image File Review Set (September 4, 2008); and

- the remaining ½ of the Image File Review Set shall be provided to Plaintiffs' counsel within twelve (12) days from the date Defendants' counsel receive the Image File Review Set (September 10, 2008).

4.      If Plaintiffs' counsel believe that specific documents and/or data contained within the Image File Review Set are improperly designated AEO, or if they believe that they need to review specific documents and/or data from the Image File Review Set with individuals that are not authorized to review AEO information, they are encouraged to first raise such issues with Defendants to see if Defendants will informally agree to an alternative designation.  If the parties cannot agree, any disputes concerning such issues shall promptly be raised with the undersigned.

5.      Plaintiffs' counsel shall have a total of twelve (12) days (or until September 16, 2008) to review the non-privileged documents and data from the Image File Review Set, however, Plaintiffs' counsel shall also meet the schedule established below.  After receiving the non-privileged documents and data from the Image File Review Set referenced in paragraph 3 above, Plaintiffs' counsel shall provide to Defendants' counsel, with a copy to the undersigned, a list of documents and data from the Image File Review Set that Plaintiffs claim are "responsive" (as that term is defined in the July 29 Order) as follows:

- the list for the first ½ of the Image File Review Set shall be provided to Defendants' counsel within six (6) days from the date Plaintiffs'

counsel receive the first ½ of the Image File Review Set (September
10, 2008); and

- the list for the second ½ of the Image File Review Set shall be
  provided to Defendants' counsel within six (6) days from the date
  Plaintiffs' counsel receive the second ½ of the Image File Review Set
  (September 16, 2008).

Any disputes that arise concerning the responsiveness of specific documents and/or data
from the Image File Review Set shall be promptly raised with the undersigned.

6.     Within seven (7) days from the date of this Order (September 3, 2008),
Plaintiffs' expert shall provide Defendants' counsel with an electronic copy of the
Supplemental Production Set in native format via a Summation load file.  At the time
Plaintiffs provide the Supplemental Production Set to Defendants, Plaintiffs' counsel may
have immediate access, on an AEO basis, to the Supplemental Production Set, for
purposes of conducting a review of the Supplemental Production Set.  Pursuant to an
agreement of the parties, the procedures set forth in the Clawback Agreement shall
govern the review of documents and data in the Supplemental Production Set.  Any
disputes that arise concerning the privileged nature of specific documents and/or data in
the Supplemental Production Set shall promptly be raised with the undersigned.

7.     If Plaintiffs' counsel believe that specific documents and/or data contained
within the Supplemental Production Set are improperly designated AEO, or if they
believe that they need to review specific documents and/or data with individuals that are
not authorized to review AEO information, they are encouraged to first raise such issues
with Defendants to see if Defendants will informally agree to an alternative designation.

If the parties cannot agree, any disputes concerning such issues shall promptly be raised with the undersigned.

8.      Within five (5) days after receiving the documents and data from the Supplemental Production Set (September 8, 2008), Plaintiffs' counsel shall provide to Defendants' counsel, with a copy to the undersigned, a list of documents and data from the Supplemental Production Set that Plaintiffs claim are "responsive" (as that term is defined in the July 29 Order).  Any disputes that arise concerning the responsiveness of specific documents and/or data from the Supplemental Production Set shall be promptly raised with the undersigned.

9.      On or before September 17, 2008, Plaintiffs shall return to Defendants and/or destroy all non-responsive documents and data from the Image File Review Set and the Supplemental Production Set, following the procedures set forth in paragraph 21 of the Confidentiality Stipulation (including the written certification requirement).

10.     Paragraph 7 of the July 29 Order is supplemented/clarified as follows:  On or before September 3, 2008, Plaintiffs' counsel shall provide to Defendants' counsel, with a copy to the undersigned, a list of documents and data from the Production Set that Plaintiffs claim are "responsive" (as that term is defined in the July 29 Order).  In all other respects, paragraph 7 of the July 29 Order remains in full force and effect.

11.     Within twelve (12) days from the date of this Order (September 8, 2008), Plaintiffs' expert shall submit a declaration to Defendants, with a copy to the undersigned, certifying that at no time have the following documents/data been included in the review environment, and that Plaintiffs' counsel have not otherwise been given access to such documents/data:

- any documents or data that were identified as "hits" using the Privilege Search Terms; and

- the 370 image files that were attached to e-mails identified using the Privilege Search Terms.

12.    If the parties anticipate problems meeting the deadlines established by paragraphs 1 – 9 of this Order, or the September 17, 2008 deadline with respect to the Image File Review Set or the Supplemental Production Set, they shall meet and confer with respect to such deadlines, and jointly raise such issue with the undersigned.

**IT IS SO ORDERED.**

BY THE COURT:

Paul D. Weiner
Special E-Discovery Master

5