## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BRO-TECH CORPORATION t/a | : | |
| THE PUROLITE COMPANY, et al., | : | |
| Plaintiffs, | : | |
| v. | : | CIVIL NO. 05-CV-2330 |
| | : | |
| THERMAX, INC. d/b/a THERMAX | : | |
| USA LTD, et al., | : | |
| Defendants. | : | |

**FILED**

SEP - 3 2009

MICHAEL E. KUNZ, Clerk
By_____Dep. Clerk

### MEMORANDUM & ORDER

**Rufe, J.**                                                                 **September 3, 2009**

### I. INTRODUCTION

In this case, Plaintiffs Bro-Tech Corporation, trading as The Purolite Company, and

Purolite International Ltd. (collectively "Plaintiffs" or "Purolite"), which are in the business of

producing ion exchange resins,[1] bring multiple claims relating to Defendants' alleged

misappropriation of their confidential and trade secret information.   There are nine named

Defendants: two corporate entities comprising part of the global energy and chemical company the

Thermax Group ("Thermax"),[2] three high-ranking employees of Thermax, and four individuals who

left the employ of Purolite to join Thermax in 2005.  Plaintiffs' Amended Complaint includes fifteen

causes of action or equitable grounds for relief, some brought against certain Defendants, and some

---

[1] Ion exchange resins are chemical solutions used to remove impurities from water and other liquid gas media.

[2] The two named Thermax entities are Thermax Ltd., and Thermax, Inc., doing business as Thermax USA Ltd.

1

brought against all.[3]  Plaintiffs bring federal claims for violations of the Racketeer Influenced and

Corrupt Organizations Act ("RICO")[4] and the Computer Fraud and Abuse Act ("CFAA"),[5] and state

law claims of Misappropriation of Trade Secrets in violation of the Pennsylvania Uniform Trade

Secrets Act ("PTSA"),[6] Unfair Competition, Tortious Interference with Existing and Prospective

Contractual and Business Relationships, Civil Conspiracy, Breach of Contract, Breach of the Duty

of Loyalty, Commercial Disparagement, Conversion and Inevitable Disclosure, as well as equitable

claims of Unjust Enrichment and Vicarious Liability and a request for preliminary and permanent

injunctions.[7]  Plaintiffs have since withdrawn the claims for Conversion and Inevitable Disclosure,[8]

and these will be dismissed.  Certain defendants have asserted affirmative defenses to equitable

claims they face.[9]  Presently before the Court are three Motions for Summary Judgment filed by

various sets of defendants,[10] which encompass virtually all of the causes of action brought against

them, and Plaintiffs' Motion for Summary Judgment as to the affirmative equitable defenses noted

---

[3] [Doc. No. 22].

[4] 18 U.S.C. § 1961, et seq.

[5] 18 U.S.C. § 1030.

[6] 12 Pa. Const. Stat. Ann. §§ 5303-08.

[7] Plaintiffs' request for preliminary injunctive relief was granted through a Court Order of September 30, 2005. [Doc. No. 42].

[8] Purolite withdrew its Conversion claim and its claim for Inevitable Disclosure via written filing.  See Pls.' Mem. Opp'n to Thermax Defs.' Mot. Summ. J. n.3 [Doc. No. 296].

[9] Answer and Counterclaims of Defendants Thermax Ltd., Thermax, Inc., S.S. Shastri, Pheroz Pudumjee, and Amitabha Mukhopadhyay ¶¶ 242 -270.  [Doc. No. 99].  The Counterclaims of these defendants were dismissed as withdrawn by Order of March 19, 2009. [Doc. No. 454].  They were the only Counterclaims present in this action.

[10] [Doc. Nos. 271, 288, 289].

above.[11]

## II. BACKGROUND

Overall, the Amended Complaint describes a scheme by Defendants to steal and use Purolite's trade secret information related to the development, production and sale of ion exchange resins. Through the alleged scheme, Purolite employees who knew or could access Purolite's proprietary chemical technology and sales information would accumulate it, quit Purolite, and go to work for Thermax, bringing Purolite's proprietary information with them for their new employer's use and benefit. The evidence adduced, viewed in the light most favorable to Plaintiffs where appropriate, reflects the following regarding the parties and events in this matter.

*A. Parties*

**1. Plaintiffs**

Plaintiff Bro-Tech Corporation t/a The Purolite Company is a corporation incorporated under the laws of Delaware with its principal place of business in Pennsylvania. Plaintiff Purolite International Ltd is a corporation owned in part by The Purolite Company. It is organized under the laws of the United Kingdom with its principal address in South Wales.[12] As noted, the plaintiffs are referred to hereinafter as "Plaintiffs" or "Purolite."

Purolite was founded, and is primarily run, by members of the Brodie family. Stefan Brodie co-founded Purolite with his brother, Don. At all relevant times, Stefan Brodie was Purolite's Chief Executive Officer and President. At all relevant times, Don Brodie was Executive

---

[11] [Doc. No. 287].

[12] Pls.' Statement of Facts Ex. 3 ("Pls.' Facts") (May 17, 2005 Certification of Jacob Brodie) ¶ 3 ("5/17/05 J. Brodie Cert."). [Doc. No. 301].

3

Vice-President of Purolite. Also, at all relevant times, Jacob Brodie, Stefan Brodie's son, was Vice-President of Purolite.[13]

Purolite began business as an importer of ion exchange resins in 1982.[14] It became an ion exchange resin manufacturer in 1984.[15] Purolite operates manufacturing sites in Philadelphia, Pennsylvania, Romania and China, and is the second largest manufacturer of ion exchange resins in the world.[16] Purolite also develops ion exchange resins and related technologies.[17]

## 2. Defendants

### a. Thermax

Defendant Thermax, Inc., d/b/a Thermax USA LTD is a Michigan corporation with its principal place of business in that state. Defendant Thermax Ltd. is a company incorporated under the laws of India. As noted previously, these Defendants are referred to hereinafter as "Thermax." Among other things, Thermax is a manufacturer of ion exchange resins.

### b. Individual Thermax Defendants: Pheroz Pudumjee, Amitabha Mukhopadhyay and S.S. Shastri

Defendants Pheroz Pudumjee ("Pudumjee"), Amitabha Mukhopadhyay ("Mukhopadhyay") and S.S. Shastri ("Shastri") have senior roles within Thermax. At all relevant times, Defendant Pudumjee was the Executive Director of Thermax, Ltd., Defendant Mukhopadhyay was the Chief Financial Officer of Thermax, Ltd., and Defendant Shastri was the President of

---

[13] 5/17/05 J. Brodie Cert. ¶ 1.

[14] 5/17/05 J. Brodie Cert. ¶ 8.

[15] Id. ¶ 9.

[16] Id. ¶¶ 14, 17.

[17] Id. ¶ 18.

Thermax, Inc.  In these roles Mukhopadhyay and Shastri bore direct responsibility for decisions regarding Thermax's ion exchange resins business in the United States.[18]   When discussed collectively, Defendants Pudumjee, Mukhopadhyay and Shastri are referred to hereinafter as the "Individual Thermax Defendants."

c. *Former Employee Defendants: Nancy Gleasman, Cindy Gresham, James Sabzali, and Narvinder Sachdev*

The four remaining Defendants are individuals who worked for Purolite before resigning in or around March, 2005, and immediately going to work for Thermax. Defendant Nancy Gleasman ("Gleasman") worked for Purolite for three years before resigning in 2005.  At the time she resigned from Purolite, she held the position, "Midwest Sales Manager."  Defendant Cindy Gresham ("Gresham") worked for Purolite for twenty-one years as a materials and product manager, and lastly, as a sales representative, before resigning in 2005.  Defendant James Sabzali ("Sabzali") worked for Purolite for nine years before resigning in March, 2005.  When he resigned from Purolite, he held the position, "North American Sales and Marketing Manager and International Marketing Manager."  Defendant Narvinder Sachdev ("Sachdev") is a trained chemical engineer and holds an MBA degree.  He worked for Purolite from October, 1986 to March, 2005.  In that time, he worked as a development chemist and a production facility manager, and ultimately held a position in which he supervised the technical quality of all Purolite products, worldwide.  When discussed collectively, Gleasman, Gresham, Sabzali and Sachdev are referred to hereinafter as the "Former Employee Defendants."

---

[18] Pls.' Facts Ex. 24 (January 11, 2007 Deposition of P. Pudumjee) at 78:7-12 ("1/11/07 Pudumjee Tr.").

## 3. Circumstances and Events underlying this litigation

*a. Purolite's business, internal operations, procedures and security*

As noted, Purolite develops, manufactures and sells ion exchange resins ("IER").

Generally speaking, "ion exchange resins are chemical substances used to purify liquids."[19]  They

consist of a polymer matrix, ordinarily in the form of a small bead, attached to a "functional group"

that is either acidic or basic.[20]  The bead, or polymer, is composed of either polystyrene or acrylic.[21]

It is made in the first basic step of IER production, called "polymerization." The polymer is attached

to a charged functional group in the second basic step of IER production, called "activation" or in

some cases, "sulfonation." Two broad categories of resin result, cation and anion exchange resins.[22]

Anion exchange resins are basic, and cation exchange resins are acidic.  Each can be either strong

or weak, depending on purpose.[23]

In general, during the process of polymerization, a suspension of monomer (the

chemical basis from which  polymers are formed), water, and suspending agents that facilitate the

formation of beads is placed in a vessel and stirred and heated in a controlled fashion until the

---

[19] Pls.' Facts Ex. 90 (October 11, 2007 Report of Lawrence Golden) at 13.

[20] Id.

[21] Id. at 13-14.  Additional important properties of the ion exchange resins relevant herein are established through the resin formulation process, including properties of solubility and permeability.  Id. at 15.

[22] Id.  "Cation resins are beads with a polymer matrix to which a negatively charged functional group is permanently attached.  To this is 'loosely' attached a positively charged 'counter-ion', which is capable of being exchanged with other positively charged cations in the substrate [or liquid] to be treated.  Conversely, anion resins contain a positively charged functional group capable of exchanging negatively charged anions with those in the substrate." Id.

[23] Id. at 18.

desired polymers are produced.[24] Suspension ingredients can be formulated to produce gel polymers or macroporous polymers, which, in turn, are used in gel or macroporous resins of different types and uses. Polymers thus produced are then rinsed and otherwise prepared for activation. The particulars of the next step, activation, vary widely depending on the type of resin to be produced, in terms of anion or cation, strength, and other desired characteristics.[25] Throughout the IER production process, precision in formulation and execution is necessary to achieve the desired result.

Purolite has spent much time and capital researching and testing its IER products and the processes by which they are made. Essential ingredients in Purolite's products may be known or discoverable.[26] Yet Purolite claims a property interest in its specific product "recipes" or formulations, and also in its exact production processes, which include factors such as time periods, temperatures and equipment used.[27] By May, 2005, through its own research efforts, Purolite had developed proprietary information with respect to many different IER products or production processes.[28] Purolite also manufactured a broad array of IERs and sold them globally.[29] It claims a proprietary interest in its confidential sales information relating to its own sales projections and targets, as well as its relationships with its customers.

---

[24] Id. at 16.

[25] As rather a generic example, activation of strong acid cation exchange resins involves placing polymers in an acid mixture of a particular type and strength, then heating to within a particular temperature range for a specified period of time. Id. at 18-19.

[26] 5/17/05 J. Brodie Cert. ¶ 25.

[27] See id. ¶¶ 25-29.

[28] For example: uniform size, non-solvent resins; macronet adsorbents; seeded, uniform particle size non-solvent gel cation resins; strong based type one acrylic anion resins; and high purity and low chloride resins. Id. ¶¶ 19, 20, 21, 24.

[29] Id. ¶ 16.

Purolite regularly customizes its products to fit the particular needs of its customers.[30] It relies on its sales personnel to communicate with customers or prospective customers about its product offerings and its ability to tailor products for clients.[31]  Purolite's sales representatives maintain contact information for prospective and actual customers, including reports of contact between themselves and such individuals.  Its sales representatives also maintain or have access to the company's pricing information and customer price goals.[32]  Purolite considers much of the non-public information it keeps with respect to its customer relationships to be proprietary.

Prior to March, 2005 Purolite guarded information on its manufacturing processes and product formulations, as well as certain customer and sales information.[33]  Purolite employed various security measures with respect to its physical facilities and its computerized data, and maintained internal policies and procedures around confidential information.[34]  Among other measures, after 2004, the company's computerized data was stored on a main server, and employee access to such data was limited in accordance with job purview.[35]  Purolite submitted an expert report from Frank Rudewicz on the security measures and policies it had in place prior to March 31, 2005.[36] Rudewicz opines that "the protection measures taken and implemented to safeguard Purolite's trade

---

[30] Id. ¶ 35.  Sometimes this is accomplished through a process of testing and screening Purolite's products against the customer's problem or requirement undertaken by both Purolite and the customer to determine what product specifications are needed.  Id.

[31] Id. ¶¶ 33-34.

[32] Id. ¶ 34.

[33] Id. ¶¶ 27, 32, 34.

[34] Pls.' Facts Ex. 8 (October 12, 2007 Report of F.E. Rudewicz), at 1 ("Rudewicz Rept.").

[35] Pls.' Facts Ex. 7 (May 22, 2005 Deposition of N. Sachdev), at 43:24; 138:13-15 ("5/22/05 Sachdev Tr.").

[36] Rudewicz Rept. at 4.

8

secret and confidential information were reasonable and adequate based upon the risks known to Purolite management prior to the theft alleged in the complaint," and sets forth numerous reasons for his conclusion.[37]  In one instance, Rudewicz notes an agreement executed by a sales employee not to disclose Purolite trade secret and "confidential" information, in which "confidential information" is defined to include information regarding sales and customer lists.[38]  In another, Rudewicz notes that so-called "batch sheets," which record the production of IER batches and contain the specific formula and process employed in the same, are accessible only to the particular engineers, chemical operators and plant employees who need to see them.[39]

While employed by Purolite, Defendants Gleasman, Gresham, Sabzali and Sachdev were each provided with a Purolite-owned computer,[40] and had broad but not unlimited authority to use Purolite's computers to access information stored on Purolite's server.[41]  Installed in each of these Purolite-owned computers was a program to provide an AOL email account, which was to be used for both personal and work purposes.  It is undisputed that each Former Employee Defendant had considerable access to Purolite proprietary information relating to product specifications, manufacturing processes and sales.

Both Gresham and Sabzali labored for Purolite under a contract entitled "Employee

---

[37] Id. ¶ 15.

[38] Id., citing Employee Patent and Trade Secret Agreement signed by Cindy Gresham, dated 9/1/94 and Purolite Standard Confidentiality and Non-Disclosure Agreements.

[39] Id. at 8-9.

[40] 5/22/05 Sachdev Tr. 35:3-21; Pls. Statement of Facts Ex. 17 (May 2, 2006 Deposition of J. Sabzali), at 123 ("5/2/06 Sabzali Tr.").

[41] Pls.' Facts ¶ 42.

Patent and Trade Secret Agreement" ("EPTSA").[42]   The EPTSAs contained provisions regarding non-disclosure of "confidential information," defined to include "strategic plans, standard costs, sales, customer lists, marketing strategies and relationships . . . ."[43]   The EPTSAs provide, "[e]mployee agrees that he will not disclose any such Confidential Information to any unauthorized person or entity for any reason whatsoever while employed by [Purolite] or afterwards without the prior written agreement of the President of [Purolite]."[44]   In the copy in evidence of Gresham's executed EPTSA, portions of the document, including the words "or afterwards" from its non-disclosure section, are crossed out and initialed.[45]   Sachdev signed an employment contract when he began working for Purolite in the late 1980's ("Sachdev Contract").   The contract included a clause regarding non-disclosure of confidential Purolite information, and required the return of all Purolite papers upon termination.[46]   While Gresham, Sabzali and Sachdev all worked under contract with Purolite, Gleasman did not.

### b.  The alleged fraud and theft scheme

As noted, Purolite alleges Defendants perpetrated a scheme to purloin much of its proprietary sales and product information for the benefit of Thermax.  Purolite asserts that Thermax, through Pudumjee, Mukhopadhyay and Shastri, orchestrated the scheme, in which Purolite information was taken and delivered to Thermax by the Former Employee Defendants in early 2005.

---

[42] Pls.' Facts Ex. 8 (EPTSA of Sabzali and Gresham, attached as Exhibits 9 and 10 to Rudewicz Rept).

[43] Id.

[44] Id.

[45] Id.

[46] 5/17/05 J. Brodie Cert. ¶¶ 41-42.

The following is a review of the facts forwarded with respect to Plaintiffs' claims.

The first contact of note reflected in the evidence between Thermax and any of the Former Employee Defendants occurred in 2003, when Sachdev approached Thermax, Thermax offered Sachdev a job, and Sachdev rejected it.  In late 2002, Don Brodie expressed dissatisfaction with Sachdev's performance as general manager of Purolite's Philadelphia plant.[47] He put Sachdev on notice that if his performance did not improve within six months he would be fired.[48]  He also changed Sachdev's role, removing him from the plant general manager position, moving his office to Purolite's corporate offices and making him quality assurance manager for Purolite's China, Philadelphia and Romania plants.[49]  These events unsettled Sachdev, who started looking for a new job in early 2003.[50]  Sachdev contacted Thermax and other chemical companies during his search.[51]  An e-mail sent by Defendant Pudumjee to his wife, Thermax chairwoman Meher Pudumjee, and Thermax executive Prakash Kulkarni on August 25, 2003, shows these company officials refining a document regarding Sachdev's potential role at Thermax.[52]  Sometime in mid-2003, Thermax offered Sachdev a position as head of quality control and business development, but he rejected it

---

[47] 5/22/05 Sachdev Tr. 90:10-16.

[48] Id. at 91:10-11, 92:20-24.

[49] Id. at 94:1-19.

[50] Id. at 101:10, 15-19; 102:1-10.

[51] Id. at 102:10.

[52] Pls.' Facts Ex. 140 (8/25/03 e-mail from P. Pudumjee with attachment: Sachdev_role.doc).  The document is entitled "Proposed Role & Responsibility for Mr. Sachadev [sic]," and contains two sections corresponding to job function areas ("Marketing" and "Quality Management Systems").  It reflects Thermax goals to penetrate the U.S. market for uniform particle size ("UPS") resins, to "[e]nable Thermax chemical division to produce high yield products through the right process" and to "manufactur[e] UPS resins of world class quality."  Id.

11

because it required extensive work in India.[53] Sachdev then abandoned his job search.[54] It was 2003. He remained with Purolite.

In August, 2004, Thermax developed a company-wide strategic plan which included an aim to increase the growth of Thermax's chemical division.[55] Internally, the plan was dubbed "Project Evergreen."[56] One stated goal of Project Evergreen was to "create $10 million dollars specialty resin business in [the] US by 2010."[57] Defendant Mukhopadhyay was responsible for implementing Project Evergreen as it related to Thermax's chemical division.[58] Ultimately, Defendants Gleasman, Gresham, Sabzali and Sachdev were hired away from Purolite by Thermax in the spring of 2005 to help implement Project Evergreen.[59] In particular, the evidence reflects the following about the recruitment and hiring of the Former Employee Defendants in late 2004 and early 2005.

1. Recruitment and hiring of Sabzali

Sabzali negotiated employment terms with Thermax in late 2004 and early 2005 while still employed by Purolite. He informed Purolite he would be resigning on February 28, 2005, worked his last day at the company on March 9, 2005, and started working for Thermax immediately

---

[53] 5/22/05 Sachdev Tr. 102:24-103:2.

[54] Id. at 103:16.

[55] Pls.' Facts Ex. 23 (January 17, 2007 Deposition of A. Mukhopadhyay) 85:18-86:1, 89:5-6 ("1/17/07 Mukhopadhyay Tr.").

[56] Id. at 89:6.

[57] Pls.' Facts Ex. 25.

[58] 1/17/07 Mukhopadhyay Tr. 91:8-13; 148:22-149:2.

[59] Id. at 174:22-175:19.

thereafter.[60]

These events commenced when Sabzali contacted Thermax chairwoman Meher Pudumjee seeking a position with the company sometime in 2004.[61] Mrs. Pudumjee referred Sabzali to Defendant Shastri, and thereafter, Sabzali was recruited by Thermax.[62]  The recruitment and negotiation process lasted several months.

During these employment negotiations, Sabzali maintained his senior marketing position at Purolite in which he was privy to information that the company treated as confidential.[63] Among other things, Sabzali had access to confidential cost data and sales information.[64]  Sabzali continued contacting customers as a high-level Purolite representative during his recruitment.  For example, on December 9, 2004, Sabzali wrote a letter to Oak Ridge National Laboratories ("Oak Ridge"), with which Purolite had an exclusive five year agreement ending in 2004 to produce a product called A530 on a commercial scale.  In the letter Sabzali informed Oak Ridge that Purolite desired to continue its license to produce A530 for Oak Ridge, and that "Purolite recognizes that a five year extension may be possible but it will be on a non-exclusive basis."[65]

Also in this period, Sabzali transmitted Purolite product manufacturing and customer information to Thermax.  He identified Purolite customers who he believed could be converted, in

---

[60] 5/2/06 Sabzali Tr. 35:2-20.

[61] 5/2/06 Sabzali Tr. 103:22-105:23.  As noted, Mrs. Pudumjee is the wife of Defendant Pudumjee.

[62] 5/2/06 Sabzali Tr. 106:6.

[63] See Pls.' Facts Ex. 21 (June 6, 2007 Deposition of J. Sabzali) 356:19-359:9.

[64] See id.

[65] Pls.' Facts Ex. 124.  Purolite represents to the Court that this letter shows that Sabzali "recommended against renewing the contract" with Oak Ridge.  The letter provides no plausible basis for Purolite to make such an assertion.

13

part or in whole, to Thermax customers, and shared such information with Shastri. For example, Sabzali sent an e-mail to Shastri on March 7, 2005, stating, with respect to Purolite's relationship with a customer, Culligan, "$2 million is half the business I feel we may be able to get away from Purolite."[66] As another example, an internal Thermax e-mail from February 10, 2005, shows that Sabzali had suggested to Thermax officials that Thermax develop a particular type of anion resin to sell to the company U.S. Filter. Purolite had sold such resin to U.S. Filter in the past, but with quality issues that a new competitor might exploit, according to Sabzali.[67] There is evidence from which it may be reasonably inferred that Sabzali used Purolite proprietary information to solicit customers for Thermax, as by referencing Purolite's pricing and delivery capabilities for particular products and then undercutting them when communicating with potential customers.[68]

Sabzali also gave Shastri information about Purolite's IER manufacturing processes and its business costs. Thus, an e-mail dating from sometime in early 2005 shows Shastri telling Mukhopadhyay that "Jim" (as Sabzali was consistently referred to by the parties herein) had "confirmed" certain production methods Purolite used to keep its water softening cation products profitable, and also reporting to Mukhopadhyay the manufacturing, transfer and freight cost Purolite

---

[66] Pls.' Statement of Facts Ex. 31 (March 19, 2007 Deposition of S. Shastri), at 411:10-16 ("3/19/07 Shastri Tr.").

[67] Pls.' Facts Ex. 141 (February 10, 2005 e-mail from Thermax executive Vivek Naik, subject: "Resins for US Filters").

[68] See Pls.' Facts Ex. 191 (e-mail string from March 18, 2005 - March 21, 2005 regarding Thermax efforts to sell strongly acidic gel-based cation to a company, Mallinckrodt, then purchasing the product from Purolite); Ex. 192 (June 8, 2005 e-mail from Sabzali to representative of Purolite customer Basin Water seeking to sell strongly basic anion resin and referencing Purolite's prices for the product in question).

paid to bring its China-made products to the United States.[69]  It may be reasonably inferred from the

e-mail message that Sabzali provided Shastri with all of the Purolite information referenced therein.

Sabzali also participated in Thermax strategy sessions before leaving Purolite.  He

created an analysis of Thermax's market segment, the company's points of strength and weakness

in the IER market, and strategies for advancement and growth within that market.[70]  This analysis

discussed opportunities for growth involving "New Products," among them various types of uniform

particle size (UPS) resins which Thermax did not then manufacture, and "New Markets," including

the market for Arsenic removal, in which Purolite had an established position.[71]

Sabzali copied and took some of Purolite's confidential financial and sales data to

Thermax after leaving Purolite's employ in March of 2005.[72]  Some such information can be highly

perishable, and Sabzali believes the specific data he took was not current, and was therefore

"useless," at the time he left Purolite.[73]  One sales-related item Sabzali took was a PowerPoint

presentation which he had helped develop for use in Purolite sales meetings regarding the arsenic

market and ways in which Purolite could attempt to enter that market, as it eventually did.[74]  After

joining Thermax, Sabzali testified that he may have modified the PowerPoint presentation to show

the name "Thermax" in place of "Purolite," otherwise left it intact, and then presented it to Thermax

---

[69] Pls.' Statement of Facts Ex. 138 (undated e-mail from "SSS" (whom for present purposes the Court presumes is Defendant S.S. Shastri) to "Amithaba", including an Original Message sent February 10, 2005 from Narvinder Sachdev to Shastri and Pheroz Pudumjee at their Thermax e-mail addresses).

[70] Pls.' Facts Ex. 34.

[71] Id.

[72] See examples of such files at Pls.' Facts Ex. 166-80.

[73] 5/2/06 Sabzali Tr. 356:19-359:9.

[74] Id. at 363:4-367:2.

officials.[75]  Also, approximately four weeks after joining Thermax, Sabzali presented a slideshow

on the company's strategic sales plan to Thermax executives that listed customers Thermax should

target for its water softening products, based on these companies' product needs.[76]  Several of the

companies listed were Purolite customers.[77]

### 2.  Sabzali recommends Thermax recruit Gleasman, Gresham and Sachdev

During a formal employment interview with the Thermax board of directors and

Shastri in late 2004, Sabzali presented information and views on IER sales in the United States and

strategic steps for Thermax to take to increase its share of the IER market in this country.[78]  Among

other things, he recommended that Thermax hire a person knowledgeable about the manufacture of

commodity IERs, including strong acid cation and uniform particle size resins.[79]  Thermax contacted

Sachdev to set up an interview during this Sabzali interview.[80]  Defendant Shastri "took the lead" in

recruiting Sabzali and Sachdev to join Thermax.[81]

Sabzali also recommended that Thermax hire Gleasman and Gresham to help increase

Thermax's North American IER sales.[82]  An e-mail communication dated March 9, 2005 sent by

---

[75] Id.

[76] Pls.' Facts, Ex. 101, at JS 005323, 005329, 005333.

[77] Id.

[78] Pls.' Facts Ex. 34.

[79] Pls.' Facts Ex. 10 (January 12, 2007 Deposition of P. Pudumjee) 307:12-309:18 ("1/12/07 Pudumjee Tr.").

[80] 1/11/07 Pudumjee Tr. 114:6-115:14.

[81] 1/11/07 Pudumjee Tr. 89:1-4; Pls.' Facts Ex. 30 (May 5, 2006 Deposition of S. Shastri) 25:20-21 ("5/5/06 Shastri Tr.").

[82] See 1/12/07 Pudumjee Tr.  309:19-317:6; Pls.' Facts Ex. 45; 3/19/07 Shastri Tr. 422:13-22.

Shastri to Amithaba and Defendant Pudumjee reflects that Sabzali had urged Thermax to hire Gleasman and Gresham to join a North American sales force that would report to him.[83]  In the e-mail, Shastri argues for the additions despite their expense by explaining that Thermax projected to grow its U.S. chemical business by over $2 million from fiscal year 2004-05 to fiscal year 2005-06, an earnings jump supported by increased projected sales in 2005-06: "Jim [Sabzali] has identified accounts worth $10 million that we hope to convert."[84]  Sabzali had begun recruiting Gleasman and Gresham before he left Purolite for Thermax,[85] although they first contacted him regarding positions with Thermax after learning he would be leaving.[86]

### 3.  Recruitment and hiring of Sachdev

Thermax began recruiting Sachdev to leave Purolite and join it in October or November, 2004.[87]  Defendants Mukhopadhyay and Pudumjee interviewed Defendant Sachdev in December, 2004,[88] and Thermax made a decision in principal to hire him around that time.[89]  Sachdev accepted an offer from Thermax on March 16, 2005.[90]  He had announced his resignation

---

[83] Pls.'s Facts Ex. 28 (March 9, 2005 e-mail from Shastri to P. Pudumjee and Mukhopadhyay).

[84] Id.

[85] 3/19/07 Shastri Tr. 422.

[86] 5/2/06 Sabzali Tr. 137:11-14.

[87] 5/22/05 Sachdev Tr. 103-104.

[88] Id. at 114-115; Pls.' Facts Ex. 11 (January 18, 2007 Deposition of A. Mukhopadhyay) 260 ("1/18/07 Mukhopadhyay Tr.").

[89] Pls.' Facts Ex. 32.

[90] Pls.' Facts Ex. 33 (Employment Agreement of N. Sachdev with Thermax, signed 3/16/05).

17

from Purolite on March 15, 2005.[91]  His last day at Purolite was March 29, 2005,[92] and he officially started working for Thermax on April 1, 2005.[93]

Sachdev's contract with Thermax listed as "deliverables" non-solvent cation resin, uniform particle size resin, fine mesh resin, and other types of IER,[94] many of which were manufactured by Purolite.[95]  Shastri consulted with Defendants Pudumjee, Mukhopadhyay and Sabzali (who was still employed by Purolite at the time) regarding the "deliverables" to be included in Sachdev's Thermax contract.[96]  Thermax was not capable of producing uniform particle size resins on a commercial scale as of March, 2005,[97] and Thermax did not bring uniform particle size and non-solvent resins to market before hiring Sachdev.[98]

While negotiating employment terms with Thermax, Sachdev requested a list of Thermax products from Defendant Shastri in order to identify differences, or "gaps," in the two companies' product lines.[99]  Shastri provided Sachdev such a list while Sachdev was still with Purolite.[100]  Also during his recruitment, Sachdev emailed Pudumjee and Mukhopadhyay, informing

---

[91] 5/22/05 Sachdev Tr. 87:12.

[92] Id. at 86:2.

[93] Pls.' Facts Ex. 33.

[94] Id.

[95] 5/22/05 Sachdev Tr. 58-59.  Plaintiffs note that UPS resins were also discussed as a "deliverable" when Thermax offered Sachdev a job in August, 2003, as previously noted.

[96] 5/5/06 Shastri Tr. 166-167, 179.

[97] 1/18/07 Mukhopadhyay Tr. 342:5-9.

[98] Pls.' Facts Ex. 34, Ex. 35, Ex. 37.

[99] Pls.' Facts Ex. 60 (April 17, 2006 Deposition of N. Sachdev) 514-515.

[100] 3/19/07 Shastri Tr. 346:7-15.

them that he was making visits to Purolite facilities around the world, and that the visits were "accomplishing a great deal" and were "important from our point of view for the future."[101] Pudumjee responded to Sachdev's email, and in an apparent reference to the foregoing statement, wrote, "[a]ll other matters – especially your visits to China, etc., I agree with you."[102]

When Sachdev resigned from Purolite, he was obligated to return all Purolite proprietary information to the company.[103] However, before he left, he copied thousands of Purolite files onto one or more personal data storage devices, or "thumb drives," which he owned.[104] Also prior to leaving, Sachdev accessed both the Purolite server and his Purolite-owned computer and deleted some quantum of files contained therein.[105] The exact nature of what he deleted is not clear, although some of it was personal information, such as personal e-mails, which he was permitted to delete.[106] Sachdev understood that he was not permitted to delete non-personal information from Purolite's server.[107]

After leaving Purolite and joining Thermax, Sachdev attached one or more of his thumb drives containing thousands of Purolite files to at least two computers owned by Thermax, one in Michigan, and one in India.[108] Sachdev downloaded the information on the thumb drive or

---

[101] Pls.' Facts Ex. 43.

[102] Pls.' Facts Ex. 74.

[103] 5/17/05 J. Brodie Cert. ¶¶ 42, 53, 54.

[104] Pls.' Facts Ex. 15 (September 23, 2005 contempt hearing) at 36:20 ("9/23/05 Hrg").

[105] 5/17/05 J. Brodie Cert. ¶¶ 60-61.

[106] 5/22/05 Sachdev. Tr. 124:17-20.

[107] Id. at 142:13-15.

[108] 9/23/05 Hrg. at 37-38, 53-55.

drives onto these Thermax computers.[109] Forensic analysis of the contents of one of the thumb drives in question showed that it contained over 12,000 files including Purolite product manufacturing processes, customer lists, product specifications for particular customers, product costs, and research and development data, among other information.[110]

### 4. Recruitment and hiring of Gleasman

Gleasman received a job offer from Thermax on March 12, 2005, announced her resignation from Purolite on March 14, 2005, with a final day of March 24, 2005, and began working at Thermax immediately thereafter.[111] As noted, she was in regular contact with Sabzali at Thermax prior to leaving Purolite.[112] In a March 12, 2005 offer letter to Gleasman, Sabzali – now acting as Thermax, Inc.'s General Manager – described how Thermax was aiming to expand its share of the North and South American IER market, and described Gleasman's potential role with the company.[113] He specified the products she would be expected to promote, including "UPS resins when they become available later this year."[114]

During early March, 2005 Gleasman corresponded with certain Purolite customers and informed them she would soon resign to work for a competitor.[115] Gleasman continued to

---

[109] Id.

[110] Pls.' Facts Ex. 77.

[111] Pls.' Facts Ex. 9 (June 1, 2007 Deposition of N. Gleasman) ("6/1/07 Gleasman Tr.") at 98:5-17; Pls.' Ex. 36 (March 12, 2005 letter from J. Sabzali to N. Gleasman).

[112] See Pls.' Facts ¶ 143 and numerous parts of record cited therein.

[113] Pls.' Facts Ex. 36.

[114] Id.

[115] See Pls.' Facts Ex. 67 & Ex. 68.

20

possess her Purolite-owned laptop containing proprietary Purolite information for several weeks after her last day with the company on March 24, 2005.[116]  She used the laptop to support her work for her new employer, Thermax.  She returned this laptop to Purolite only after transferring some or all of its contents to a thumb drive and a laptop owned by Thermax,[117] including Purolite documents marked as confidential.[118]

Gleasman began to compile a list of potential customers for Thermax immediately upon starting to work there.  The list consisted of customer names, addresses, phone numbers, and email addresses, as well as, in some cases, notes about conversations or meetings Gleasman had held with the potential customer.[119]  In making the list, she retrieved such information from the Purolite-owned computer that she continued to possess for several weeks after leaving Purolite.[120]  Gleasman had gathered some of this information while employed at Purolite, but a significant amount of it – for example, information regarding the majority of Purolite's domestic accounts for water softening products – was already in Purolite's possession when Gleasman arrived.[121]  Gleasman used the customer information to cultivate business for Thermax, including during her final weeks as a Purolite employee.[122]

---

[116] 6/1/07 Gleasman Tr. at 275:4.

[117] Id. at 266:17-21.

[118] See, e.g., Pls.' Facts Ex. 143; Ex. 144; Ex. 213; Ex. 145.

[119] 6/1/07 Gleasman Tr. at 316:4-10.

[120] Id. at 312:14, 22-23.

[121] Id. at 41:1-11.

[122] See Pls.'s Facts Ex. 68 (Gleasman email to PSI Water representative).

5.  Recruitment and hiring of Gresham

Gresham accepted a job offer from Thermax in mid-March, 2005, announced her resignation from Purolite on March 14, 2005, with a final day of March 24, 2005,[123] and began working at Thermax immediately thereafter.  Before she left Purolite she transferred files from her Purolite computer to a computer given to her by Thermax,[124] including Purolite sales documents which she knew were confidential.[125]  Prior to returning Purolite's computer, she deleted all information from the AOL account it contained.[126]  Gresham was permitted to delete her personal emails from the AOL account, but not any Purolite-related emails.[127]

Before Gresham left Purolite she was copied to a string of e-mails among Thermax employees with the subject line, "Samples: Donaldson & ABA Water."[128]  The message string begins with an exchange on March 16, 2005, between Jim Sabzali, then of Thermax, and Vivek Naik of Thermax regarding IER bead specifications required by a potential customer, Donaldson, as told to Sabzali.  Gresham is copied to the email exchange along with two other people.  On March 22, 2005, two days before she left Purolite, Gresham responded to the string of emails, writing to Naik to request analysis and pricing information on Thermax unsieved beads – a product discussed in the

_____

[123] Pls.' Facts, Ex. 13 (May 1, 2006 deposition of C. Gresham) ("5/1/06 Gresham Tr.") at 253:4.

[124] Id. at 153:1-2.

[125] 5/1/06 Gresham Tr. at 168:15-16.

[126] Pls.' Facts Ex. 16 (September 5, 2007 deposition of Jacob Brodie) ("9/5/07 J. Brodie Tr.") at 943-44, 988-89.

[127] 5/1/06 Gresham Tr. 142:2-143:18.

[128] Pls.' Facts Ex. 61.

22

emails as potentially of interest to Donaldson.[129]  Confronted at her deposition with this email Gresham repeatedly stated that she did not attempt to solicit customers for Thermax at any time before leaving Purolite on March 24, 2005.[130]

Gresham retained Purolite documents after leaving Purolite's employ, but she did not access any Purolite-owned computer. Among the files Gresham retained on her Thermax computer was Purolite's 2005 Sales Forecast for the Southeastern United States (the "2005 Forecast"), which contained Purolite's projections for sales to targeted customers in a variety of categories, including customer product, selling price, and Purolite's gross margin.[131]  Gresham knew Purolite considered this information confidential.[132]  Gresham testified that she never used the 2005 Forecast or other Purolite information after leaving Purolite.[133]  However, there is evidence in the record that Gresham sent Purolite documents relating to particular product formulations, production and testing processes to Sabzali and Vivek Naik of Thermax, among others, on March 30, 2005, and June 2, 2005, after she joined Thermax.[134]  There is also evidence that a representative of the Culligan Company e-mailed her at Purolite on March 15, 2005, requesting pricing on certain Purolite products, and that

---

[129] Id.

[130] 5/1/06 Gresham Tr. 250-263.

[131] Id.

[132] Id. at 168:15-16.

[133] Id. at 156:5.  Plaintiffs have adduced evidence of several other purportedly confidential or proprietary files Gresham loaded from her Purolite computer onto her Thermax computer.  See record evidence cited to in Pls.' Facts ¶ 190.

[134] Pls.' Facts Ex. 203 (March 30, 2005 e-mail from Gresham to V. Naik, including Purolite's "technical data sheet" for a product Purolite produced for customer Ecowater); Ex. 206 (June 2, 2005 e-mail from Gresham to Sabzali and Gleasman including an array of specifications on two Purolite products which Thermax wished to imitate, produce and sell).

Gresham did not respond until April 4, 2005, after joining Thermax, and only then with information on comparable Thermax products.[135]

### 6.  Events at Thermax in early and mid-2005

Mary Schuler, a Thermax employee in the company's Novi, Michigan, U.S. headquarters with job functions in finance, office management and human resources, was given the task of creating new employee files for Gleasman, Gresham, Sabzali and Sachdev in February or March of 2005.[136]  Schuler reported to Shastri.  She spoke to Shastri expressing surprise and confusion about the hires of the Former Employee Defendants.[137]  When she stated, "that's industrial sabotage . . . [t]ell me [Sachdev] is not going to take proprietary information from Purolite," Shastri did not respond.[138]  She later confronted Defendant Pudumjee, stating, "I can't believe you're committing industrial sabotage against a competitor by hiring four of their people and one of them is bringing formulas and processes with him."[139]  Schuler was fired days later, on May 9, 2005.[140]

A brief time after Schuler's firing, Thermax, Inc.'s warehouse manager Daniel Naffin was instructed by Shastri to be alert to a delivery of certain boxes to Thermax's Novi, Michigan warehouse.[141]  When the boxes were delivered Naffin brought them to Shastri's office, where he

---

[135] Pls.' Facts Ex. 210.

[136] Pls.' Facts Ex. 29 (November 19, 2007 Affidavit of Mary Schuler).

[137] Id.

[138] Id.

[139] Id.

[140] Id.

[141] Pls.' Facts Ex. 78 (November 19, 2007 Affidavit of Daniel Naffin).

found Shastri and Sachdev, whom he had not previously met.[142]   Naffin opened the boxes and re-packed their contents, as instructed by Shastri.   Naffin saw that they contained papers marked "Purolite" and "confidential."  Naffin then took the re-packed boxes to the DHL/overseas shipments area of the warehouse.  He never saw the boxes again.[143]

Purolite has adduced expert evidence with respect to the IER formulae and processes at issue and also with respect to damages.  Lawrence Golden is Purolite's primary IER expert, and Dr. Alexander Klibanov is Purolite's additional IER expert.  In one original and two supplemental reports produced during the lengthy course of this litigation Golden opines that "Thermax has obtained and made use of Purolite's proprietary information respecting the manufacture of ion exchange resins."[144]  In particular, Golden has identified 79 Purolite technologies related to IER production in the files found on Sachdev's thumb drive, and has opined that these technologies could be applied to improve or develop a broad range of IER products.[145]  Upon review of Thermax production and laboratory files produced herein and dating from relevant time periods, it is Golden's opinion that Thermax has actually used seven of the Purolite technologies at issue since March, 2005, and that Thermax is positioned to use at least six more.[146]  Klibanov seconds these opinions.[147]

One example forwarded by Purolite to illustrate the alleged manner in which Thermax obtained and sought to use confidential Purolite customer information relates to a product called

---

[142] Id.

[143] Id.

[144] Pls.' Facts Ex. 182 (May 21, 2009 Supplementary Expert Report of L. Golden) ("Golden III") at 8.

[145] Pls. Facts Ex. 6 (January 8, 2007 Deposition of L. Golden) ("1/8/07 Golden Tr.") 296:9-297:2.

[146] Id. at 286:4-289:7.  Golden refers to these thirteen technologies as "Cases" one through thirteen.

[147] Pls.' Facts Ex. 93 (October 6, 2007 Expert Report of A. Klibanov) at 5-6, 14-38.

ArsenXnp. At all relevant times, SolmeteX, a chemicals firm, was a Purolite customer.[148] SolmeteX patented a product to remove arsenic from water called ArsenXnp, and approached Purolite in 2004 to develop jointly a process that would enable commercial production of the product. On September 29, 2004, Solmetex and Purolite entered into a contract whereby Purolite became the exclusive manufacturer of ArsenXnp. The contract provided that "[a]ny improvements, discoveries, and changes by Purolite in the course of [the ArsenXnp research and development] and any Intellectual Property conceived, created, or developed by Purolite in performance under this contract will be the joint property of both Purolite and SolmeteX."[149] The contract's term was ten years. Sabzali negotiated the contract for Purolite while still employed there, and also created Purolite's plan for the marketing and sales of ArsenXnp.[150] Purolite developed and refined the product formula after obtaining the SolmeteX exclusive contract.[151] Don Brodie testified that sales of ArsenXnp generated one million dollars in revenue for Purolite in 2005, and were anticipated to generate twice that amount in 2006.[152]

A February, 2005 e-mail between Shastri and Sachdev and copied to Defendant Pudumjee shows that these defendants had explicitly discussed ArsenXnp and a closely related product during Sachdev's recruitment by Thermax.[153] On March 10, 2005, while negotiating his

---

[148] Pls.' Facts Ex. 112A (November 21, 2005 Affidavit of D. Brodie).

[149] Pls. Facts Ex. 112.

[150] Pls.' Facts Ex. 12 (March 16, 2007 Deposition of J. Brodie) 237, 263-64.

[151] Pls.' Facts Ex. 112A.

[152] Id.

[153] Pls.' Facts Ex. 138.

departure from Purolite to work at Thermax, Sachdev received an email from a Purolite employee containing Purolite's current formula for the ArsenXnp product.[154]   Sachdev had no involvement in Purolite's ArsenXnp project or its relationship with SolmeteX, and had no reason within the scope of his employment to possess the ArsenXnp formula.[155]

On June 26, 2005, after he and Sachdev had joined Thermax, Sabzali sent an e-mail to numerous Thermax employees in which he summarized the procedure for manufacturing ArsenXnp on a commercial scale.  The e-mail stated that Thermax soon would be receiving an order for approximately five hundred thousand dollars worth of ArsenXnp from SolmeteX, that SolmeteX intended to sign a long term manufacturing, sales and distribution contract with Thermax for the product, and that the company intended to cancel its existing contract with Purolite.[156]  On July 7, 2005, SolmeteX representatives met with Thermax employees Sabzali, Sachdev and Vivek Naik.[157] The SolmeteX representatives expressed a lack of confidence in Purolite's ability to produce ArsenXnp of acceptable quality, and Sabzali convinced the company to place an for order "back up" ArsenXnp with Thermax.[158]  In a July 12, 2005 e-mail to Shastri, Mukhopadhyay, Sabzali and Sachdev regarding the meeting, Naik wrote, "[p]lease do not share this information with anybody as SolmeteX has exclusivity agreement with Purolite for manufacturing this resin."[159] It appears that, at some point between July, 2005, and January, 2006, SolmeteX suspended its contract with Purolite

---

[154] Pls.' Facts Ex. 113.

[155] Id.

[156] Pls.' Facts Ex. 114.

[157] See Pls.' Facts Ex. 115.

[158] Id.

[159] Pls.' Facts Ex. 116.

for ArsenXnp.[160] Ultimately, a January 13, 2006 letter from SolmeteX's president to Purolite shows

that, while the Purolite-SolmeteX contract for ArsenXnp was temporarily suspended, it was not

cancelled, and was reinstated as of January 13, 2006, under all original terms.[161] Plaintiffs assert that

SolemetX told Thermax to stop producing ArsenXnp at that time.

Purolite has also adduced evidence of disparaging communications made about

Purolite to Purolite customers by certain Former Employee Defendants after they joined Thermax.

A primary example is a July 14, 2005 e-mail response from Gleasman to a Purolite customer who

had written to her, telling her that Purolite had charged him an analysis fee which he had not

expected, and that he had told a Purolite representative that he was not going to pay it.[162] In part,

Gleasman's reply stated:

> DO NOT PAY THEM THAT INVOICE!!!!!  I can't believe the shit they
> have pulled.  I am ashamed to have been affiliated with them.  All is well on
> this end though.   This company is absolutely amazing.   Their integrity,
> morals, business and personal ethics are so refreshing!!!! . . . Amazing what
> quality you can make when you manufacture with the correct % DVB and
> don't cut back on anything.[163]

In a second example, Jacob Brodie testified that in the summer of 2005 he learned that Gleasman

had communicated to Purolite customer Culligan that Purolite was changing its manufacturing

processes in certain ways, resulting in poor quality products,[164] and that Gresham had told a Culligan

---

[160] See Pls.' Facts Ex. 118.

[161] Id.

[162] Pls.' Facts Ex. 106.

[163] Id.

[164] Pls.' Facts Ex. 129A (March 15, 2007 Deposition of J. Brodie) 78-79 ("3/15/07 J. Brodie Tr."); Ex. 107
(July 16, 2007 Deposition of J. Brodie) 391:18-393:16 ("7/16/07 J. Brodie Tr."); Ex. 136 (August 23, 2007
Deposition of J. Brodie) 566:7-569-9 ("8/23/07 J. Brodie Tr.").

representative that she believed Purolite was mixing its U.S.-made and China-made products and mislabeling the final product as having been made in this country.[165]

Sachdev and Thermax do not presently mount an attack on the evidence that Sachdev introduced to Thermax Purolite proprietary "recipes" and "know-how" related to the production of several types of IER in early 2005, and that Thermax applied some of this information in its production of IERs thereafter.[166] While it similarly appears that Gleasman, Gresham, and Sabzali brought a variety of Purolite information with them to Thermax and put such information to use for Thermax in March, 2005 and after,[167] the exact legal status of this information is presently contested and will be discussed below.

## 4. Procedural background and the instant Motions

Purolite filed a Verified Complaint, Motion for Preliminary Injunction and Motion for Temporary Restraining Order against Thermax, Inc., and Sachdev on May 18, 2005.[168] These original parties entered a Stipulated Temporary Restraining Order which the Court approved on May 20, 2005, that restrained and enjoined the then-named Defendants from a broad array of conduct relating to use of Purolite confidential information.[169] On August 1, 2005, Purolite filed an Amended

---

[165] 3/15/07 J. Brodie Tr. 78-79; 7/16/07 J. Brodie Tr. 391:18-393:16; 8/23/07 J. Brodie Tr. 566:7-569-9.

[166] Pls.' Facts Ex. 79 (internal Thermax e-mail from May or June, 2005, among K. Deshpande and Thermax development chemists stating, among other things, "NS has given recipe for non solvent cation resin"); 1/12/07 Pudumjee Tr. 412:7-8.

[167] Indeed, some evidence seen above suggests that these Thermax employees continued to possess and use documents to which Purolite could make a proprietary claim in June of 2005 and beyond. This and other evidence underlies the pending motions for contempt and sanctions brought by Purolite.

[168] Doc. Nos. 1, 2.

[169] Doc. No. 8.

Complaint against all current Defendants that is the operative pleading from the Plaintiffs.[170]  The following causes of action appear in the Amended Complaint and remain in contention.[171]

Against all Defendants, Plaintiffs bring claims for Misappropriation of Trade Secrets in violation of the Pennsylvania Uniform Trade Secrets Act ("PTSA"),[172] Common Law Unfair Competition, Tortious Interference with Existing and Prospective Contractual and Business Relationships, and Civil Conspiracy, and also seek imposition of a Preliminary and Permanent Injunction.

Plaintiffs bring additional claims against sub-sets of Defendants.  Against Gresham, Sabzali and Sachdev, Purolite brings a claim of Breach of Contract.  Against all of the Former Employee Defendants, Purolite brings a claim for Breach of the Duty of Loyalty.  Against Gleasman, Gresham and Sachdev, Plaintiffs bring a claim for Violation of the Computer Fraud and Abuse Act ("CFAA").[173] Against Gleasman and Thermax, Plaintiffs bring a claim of Common Law Commercial Disparagement.  Against Gleasman, Gresham, Mukhopadhyay, Pudumjee, Sabzali, Sachdev and Shastri, Plaintiffs bring claims under 18 U.S.C. sections 1962(c) and (d) ("RICO").  And against Thermax alone, Plaintiffs seek relief under theories of Unjust Enrichment and Vicarious Liability. In their Answer to Purolite's Amended Complaint, filed in March of 2006, Defendants raised various affirmative defenses, one of which – the equitable defense of unclean hands – is presently at issue,

---

[170] Doc. No. 22.

[171] As noted previously, Plaintiffs have withdrawn altogether claims for Conversion and Inevitable Disclosure, and have withdrawn as to Gleasman only the claim for Breach of Contract, and these claims will be dismissed.

[172] 12 PA. CONST. STAT. ANN. §§ 5303-08.

[173] 18 U.S.C. § 1030.

as well as several Counterclaims which have heretofore been dismissed as withdrawn.[174]

This litigation is now over four years old. It has been marked by aggressive tactics, rampant motions practice and conflagrations at every conceivable turn, as a review of the docket reveals.[175] Defendants and Plaintiffs filed a combined total of four Motions for summary judgment in late 2007 and early 2008, with briefing complete by mid-March, 2008. At a conference on April 15, 2008, Plaintiffs asked the Court to defer entering its ruling on the summary judgment Motions on the ground that material discovery abuses by Defendants had just come to light. Perhaps unsurprisingly, Defendants did not object to the delay. The Court granted Plaintiffs' request, and established an additional period of discovery and a schedule for pre-trial proceedings including the filing of supplementary expert reports and summary judgment briefs. This supplementary briefing schedule was extended multiple times at party request, and finally concluded in late July, 2009.

In three separate Motions, Defendants have moved for summary judgment on virtually all of Purolite's claims.[176] Likewise, Plaintiffs have moved for summary judgment on Thermax's Counterclaims and certain equitable affirmative defenses raised by various Defendants, but after the dismissal of Thermax's Counterclaims and other developments, only the equitable defense of unclean hands remains at issue. The Court has considered each Motion, Response in Opposition, and all additional replies, as well as the voluminous evidentiary materials submitted by the parties,

---

[174] Thermax and the Individual Thermax Defendants have not pressed the affirmative defense of mitigation asserted in their Answer, and with respect to which, Purolite moved for summary judgment. This affirmative defense will be dismissed. Thermax's Counterclaims were dismissed in a Memorandum and Order of March 20, 2009 [Doc. No. 454].

[175] Indeed, Motions for contempt and sanctions have been filed more than once, by several parties.

[176] The Former Employee Defendants and Individual Thermax Defendants moved for summary judgment as to Plaintiffs' RICO claims in December, 2007 [Doc. No. 271]. Thermax and the Individual Thermax Defendants filed a Motion for Summary Judgment [Doc. No. 289], as did the Former Employee Defendants [Doc. No. 288], with respect to virtually all of Purolite's remaining claims.

and these Motions are now ready for disposition.

## III. SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(c), a court may grant summary judgment only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[177] A fact is "material" if it could affect the outcome of the suit, given the applicable substantive law.[178] A dispute about a material fact is "genuine" if the evidence presented "is such that a reasonable jury could return a verdict for the nonmoving party."[179]

When considering a summary judgment motion, the Court does not weigh the evidence or make credibility determinations. Moreover, "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."[180]  An inference based on speculation or conjecture cannot create a material fact.[181]

The party moving for summary judgment on a claim has the initial burden of demonstrating that there is no genuine issue of material fact as to that claim.[182] If the movant satisfies this requirement, the nomovant cannot rest on its pleadings, but rather must "set out specific facts showing a genuine issue for trial," in order to avoid summary judgment.[183] The nonmovant does so

---

[177] Fed. R. Civ. P. 56(c) (2007).

[178] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

[179] Id.

[180] Id. at 255.

[181] Robertson v. Allied Signal, Inc., 914 F.2d 360, 382 n.12 (3d Cir. 1990).

[182] Callahan v. A.E.V., Inc., 182 F.3d 237, 252 n.11 (3d Cir. 1999).

[183] Fed. R. Civ. P. 56(e)(2).

by submitting evidence that would establish the essential elements of its claim.[184]   The facts the nonmovant relies on for this purpose must be demonstrated by evidence that is capable of being admissible at trial.[185]   In sum, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"[186]

## IV.  DISCUSSION

The Court first addresses Defendants' Motions for summary judgment, then turns to the remaining issue in Plaintiffs' Motion.

### A.  Summary Judgment as to Plaintiffs' Claims

## 1.  Plaintiffs' RICO Claims - Counts XI and XII

### a.  RICO Allegations and Basis for Motion

Purolite brings claims against the Former Employee Defendants and the Individual Thermax Defendants (collectively, the "RICO Defendants") for violations of 18 U.S.C. § 1962(c) and § 1962(d).  To make out a claim under § 1962(c) a plaintiff must show that each defendant (1) conducted or participated in the conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.[187]   A violation of § 1962(d) is established through evidence of a conspiracy to act in a manner that violates § 1962(c).  Here, the alleged enterprise is Thermax.[188]   Plaintiffs allege the RICO Defendants directly and indirectly conducted Thermax's affairs in a manner constituting a

---

[184] Celotex Corp. v. Catrett, 477 U.S. 317, 331 (1986).

[185] Callahan, 182 F.3d at 252 n. 11.

[186] Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted).

[187] Lum v. Bank of Am., 361 F.3d 217, 223 (3d Cir. 2004).

[188] The specific elements of Purolite's RICO claims are set forth in some detail in Plaintiffs' RICO Case Statement. [Doc. No. 101].

"pattern of racketeering activity" that injured Purolite.   Substantively, Purolite alleges criminal activity in the form of mail and wire fraud, transportation of stolen goods and receipt of stolen goods, as well as a conspiracy to commit such crimes.   The constituent predicate acts alleged are e-mail and telephone calls in furtherance of a scheme to defraud Purolite of its proprietary information, actual conversion of Purolite information in the form of electronic and paper files, and delivery and receipt of such information obtained through fraud or theft.   Purolite also argues that use or threatened use of proprietary information thus obtained constitutes a predicate act for RICO purposes.

The RICO Defendants move for summary judgment on Purolite's RICO claims, asserting that Plaintiffs' evidence is incapable of establishing that they engaged in a "pattern of racketeering activity" because it demonstrates neither of the two types of "continuity" which could show such a pattern under applicable law.   At most, the defendants claim, Plaintiffs' evidence demonstrates that the alleged pattern lasted for approximately eight months, a length of time that cannot satisfy the durational requirement for the continuity element of a RICO claim.   The RICO Defendants assert that because no genuine fact issue appears around the duration of the alleged pattern, summary judgment is appropriate as to Plaintiffs' claim under § 1962(c).   And if summary judgment is granted as to the § 1962(c) claim, the RICO Defendants contend it should be granted as to Plaintiffs' § 1962(d) claim as well, since a conspiracy claim under § 1962(d) cannot lie absent a showing of a substantive RICO violation.

b. *Facts*

The Court finds that no genuine issue exists as to the following facts.   The first communication between any of the RICO Defendants regarding the alleged scheme to defraud occurred, at the earliest, in August, 2004.   Evidence could support the inference or conclusion that

34

it was then that the Individual Thermax Defendants acted to implement a strategy to hire Sabzali, Sachdev, Gleasman and Gresham, and thereby obtain Purolite proprietary information through the machinations of these Former Employee Defendants.

Thus, the Court finds that the evidence does not support an inference that Sachdev's approach of Thermax in early 2003 and Thermax's subsequent job offer to him in mid-2003 were related to or done in furtherance of the later alleged scheme described above. It appears that Sachdev approached several companies in early 2003, Thermax among them, because he believed he would soon be fired from Purolite. Unlike the evidence adduced from the late-2004, early-2005 period, the previously-seen internal Thermax e-mail from August, 2003, discussing Sachdev's potential role at the company does not evince any intent or plan to obtain Purolite proprietary information through fraud, theft or otherwise. The e-mail shows Thermax's general desire to enter or improve its standing in various U.S. IER markets, including the market for UPS resins, and to improve the quality of everything from its products and manufacturing processes to its documentation and health procedures. But evidence of a company's desire to strengthen perceived weaknesses cannot be considered evidence of a predicate criminal act without at least a hint of some sort of reasonably concurrent and related offense conduct. Yet no evidence appears from around the time of Sachdev's 2003 discussions with Thermax suggesting that a scheme to misappropriate trade secrets had yet been devised. In this absence of evidence, Sachdev's 2003 job discussions with Thermax will not be considered an aspect of the alleged RICO scheme.

Evidence does show that e-mail and telephone communication among and between the RICO Defendants regarding the alleged scheme to defraud increased in frequency and intensity throughout November and December, 2004, and through early 2005, culminating in Sabzali,

Gleasman, Gresham and Sachdev resigning from their positions at Purolite to accept positions at Thermax in March, 2005. At least one RICO Defendant – Sachdev – admitted that he took copies of confidential Purolite information when he left Purolite's employ in March, 2005, and subsequently put this information into Thermax-owned computers. It is contested whether Sabzali, Gleasman and Gresham delivered a variety of Purolite proprietary information to Thermax when they came. In contrast, it is undisputed that the last month in which any RICO Defendant was employed by Purolite was March of 2005. No evidence appears to suggest that any RICO Defendant could access Purolite facilities or Purolite's computer network after that month. Moreover, no evidence appears to suggest that any RICO Defendant obtained any Purolite proprietary information after March 31, 2005.

Plaintiffs set forth additional evidence which they contend should inform the Court's ruling as to the RICO claims. Plaintiffs assert that, while the means of the alleged RICO scheme were fraud and theft during 2004 and 2005, its purpose was to misappropriate confidential Purolite information which Thermax could use to improve its manufacturing efficiencies, reduce its costs, reach new customers and develop new products, and thus compete unfairly with Purolite, thereafter. Plaintiffs point to evidence showing that after Sabzali, Sachdev, Gleasman and Gresham misappropriated confidential Purolite information and delivered it to Thermax in March, 2005, Thermax proceeded to use this information to achieve the goals stated above. Purolite offers several alleged examples of such use, and contends that the threat of future use of the misappropriated information, to Thermax's unfair advantage and Purolite's detriment, will continue indefinitely into the future.

36

*c. RICO Discussion*

Plaintiffs bring two claims under RICO, one substantive, for violation of 18 U.S.C. § 1962(c), and one alleging a conspiracy to violate § 1962(c), as prohibited under § 1962(d). Because "any claim under section 1962(d) based on conspiracy to violate the other subsections of section 1962 must fail if the substantive claims are themselves deficient,"[189] this analysis begins with the RICO Defendants' Motion as to Plaintiffs' substantive RICO claim.

Section 1962(c) of the RICO statute makes it "unlawful for any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."[190] The RICO Defendants ground their Motion on a challenge to the capacity of Plaintiffs' evidence to show the "pattern" element of the claim.[191]

To satisfy the "pattern" requirement, a plaintiff must demonstrate, among other things, that the racketeering acts alleged "amount to or pose a threat of continued criminal activity."[192] The requisite "continuity" can be either closed- or open-ended in form.[193] Closed-ended continuity is established by "proving a series of related predicates over a substantial period of time,"[194] which, under the case law of this Circuit, appears to mean a period of at least twelve

---

[189] Lum, 361 F.3d at 227 n.5.

[190] 18 U.S.C. § 1962(c).

[191] Thus, they do not at present challenge the evidence with respect to the existence of an enterprise or participation in the enterprise's affairs.

[192] H.J., Inc., v. Northwestern Bell Tel. Co., 492 U.S. 229, 241 (1989).

[193] See id; Tabas v. Tabas, 47 F.3d 1280, 1292 (3d Cir. 1995).

[194] H.J., 492 U.S. at 242. The "relatedness" of the predicate acts carried out in late 2004 and early 2005 is not challenged at present and is not addressed herein. Only the continuity element is.

consecutive months.[195]   In contrast, open-ended continuity is shown through "past conduct that by its nature projects into the future with a threat of repetition."[196]  The predicate offenses at issue here are mail fraud, wire fraud,[197] and interstate transportation and possession of stolen property.[198]  As to continuity generally, the Supreme Court has explained that "[p]redicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct."[199]

Regarding the question of continuity in this case, RICO Defendants argue that Plaintiffs allege a pattern of racketeering activity that lasted, at most, eight months, between sometime in August, 2004, when the earliest evidence of a potential predicate act by any RICO Defendants appears, and late March, 2005, when the final RICO Defendant left the employ of Purolite.  In other words, RICO Defendants argue the alleged scheme to misappropriate Purolite's information through related predicate acts of theft and fraud, as well as any threat of future theft or fraud against Purolite by the defendants, began and ended within this period of time.

In contrast, Plaintiffs would have the Court find that the claimed RICO pattern of

---

[195] See Tabas, 47 F.3d at 1293.

[196] H.J., 492 U.S. at 241.

[197] It is unlawful under the mail fraud statute to use the mails for the purpose of committing fraud. 18 U.S.C. § 1341.  It is a crime under the wire fraud statute to transmit any communication by wire in interstate commerce for the purpose of committing fraud.  18 U.S.C. § 1343.  "To constitute wire or mail fraud, the contents of the communications sent by mail or wire need not be fraudulent and communications need not be an essential part of the fraudulent scheme.  It is only necessary that they be 'incident to an essential part of the scheme.'" Freedom Medical, Inc. v. Gillespie, No. 06-3195, 2007 WL 2480056, at *14 n.7 (E.D. Pa. Aug. 29, 2007) (quoting Schmuck v. United States, 489 U.S. 705, 714 (1989)).

[198] The transporting stolen property statute is 18 U.S.C. § 2314, while the statute against receiving stolen property is 18 U.S.C. § 2315.

[199] H.J., 492 U.S. at 242.

racketeering activity continued through at least August 2007, and potentially to the present and beyond, since after the defendants misappropriated Purolite's information, they allegedly used it for the benefit of the enterprise, Thermax. Based on this view, Purolite contends that the evidence could support a finding of both closed- and open-ended continuity: closed-ended because the scheme began in late 2004 and lasted at least until an episode of alleged use of the misappropriated information by Thermax in August 2007, and open-ended because, now that Thermax has seen the Purolite information, it can never "unlearn" it and could potentially use it for years to come. Purolite thus treats the use of misappropriated information by Thermax as a predicate act of the scheme to defraud. That is, it conflates the use of the proceeds of a scheme to defraud and fraud itself.

      The evidence presented is incapable of establishing closed- or open-ended continuity. With respect to closed-ended continuity, the alleged scheme to misappropriate Purolite information through fraud concluded when the targeted information was misappropriated and all relevant Defendants left Purolite's employ. It does not appear that, thereafter, further acts of fraud resulting in the misappropriation of Purolite information occurred, let alone several months' or years' worth of such acts. Without more, the use of information misappropriated through the alleged fraud does not constitute the sort of "continued *criminal* activity" Purolite must identify in order to demonstrate continuity.[200] The alleged subsequent business use of the misappropriated information does not function to extend the fraudulent scheme's duration because such use is not a predicate act of the scheme; indeed, it was possible only because the fraud had reached fruition and achieved the

---

[200] National Risk Management v. Bramwell, No. 92-4366, 1992 WL 368370, at * 4 (E.D. Pa. Dec. 3, 1992) (emphasis in original); see also Davis v. Grusemeyer, 996 F.2d 617, 627 (3d Cir. 1993).

misappropriation at issue.[201]   Thus, at most, the evidence shows that the alleged scheme was consummated within eight months – not a "substantial period of time" that might establish closed-ended continuity under RICO.[202]   Purolite's closed ended continuity theory therefore fails.

Moreover, "[a] short-term scheme threatening no future criminal activity will not suffice" to demonstrate open-ended continuity.[203]  Here, the defendants have demonstrated that there is no genuine issue of material fact as to whether a similar fraudulent misappropriation, or any predicate act incidental to the same, threatens to occur again in the future.  RICO Defendants' alleged ongoing business use of the information, relied on by Plaintiffs to demonstrate open-ended continuity, is simply not the type of long-term criminal activity that RICO prohibits.[204]  Causes of action for misappropriation of trade secrets or unfair competition, among others, may allow Plaintiffs a remedy for any unfair business use of the allegedly misappropriated information at issue here, but such use, occurring after the conclusion of the fraudulent scheme and employing its proceeds, does not itself amount to or threaten future criminal activity.  The law on this point is clear.[205]  Plaintiffs' open-ended continuity theory thus fails as well.

---

[201] See Kehr Packages, Inc., v. Fidelcor, Inc., 926 F.2d 1406, 1418 (3d Cir. 1991).

[202] See Tabas, 47 F.3d at 1293.

[203] Kehr, 926 F.2d at 1412.

[204] Bramwell, 1992 WL 368370, at * 4 ("[t]he mere fact that defendants could possibly continue to benefit from their past criminal conduct is insufficient [to establish a threat of future criminal activity], to conclude otherwise would render the continuity requirement meaningless").

[205] See, e.g., Binary Semantics Limited v. Minitab, Inc., No. 07-1750, 2008 WL 763575, at *4 (M.D. Pa. Mar. 20, 2008); Clement Communications, Inc., v. American Future Sys., Inc., No. 89-6280, 1990 WL 106762, *6 (E.D. Pa. July 19, 1990) ("Once the defendants left [the plaintiff's] employ and put his trade secrets to work in their own business, the harm to [the plaintiff] was done and the scheme ended. There could be no ongoing theft of trade secrets by defendants as they could hardly go back to [the plaintiff's] employ to steal more . . . Rather than a federal court action with potential treble damages, plaintiff's remedy . . . is to seek damages from defendants [for theft of trade secrets]"); see also Kehr, 926 F.2d at 1419; Grusemeyer, 996 F.2d at 627; Bramwell, 1992 WL 368370, at * 4 - *5.

40

Because the evidence does not permit Plaintiffs to establish continuity, as is necessary to sustain their substantive "pattern of racketeering activity" claim under RICO section 1962(c), summary judgment will be granted to RICO Defendants on that claim. As a consequence, summary judgment will also be granted as to Plaintiff's conspiracy claim under section 1962(d), since "the existence of a RICO conspiracy rises or falls on the existence of a substantive RICO violation,"[206] and no other substantive RICO violation is here alleged.

Accordingly, Counts XI and XII will be dismissed.

## 2. Plaintiffs' CFAA Claim - Count VIII

Defendants Gleasman, Gresham, and Sachdev move for summary judgment on Count VIII of Purolite's Amended Complaint, wherein Plaintiffs allege that these defendants violated the Computer Fraud and Abuse Act ("CFAA").[207]  It appears Plaintiffs claim violations of sections 1030(a)(4) and (a)(5) of the Act.[208] Factually, Plaintiffs base the claims on the deletions of e-mails and files located on Purolite-owned computers and Purolite's server, done by Gleasman, Gresham and Sachdev around the time that they joined Thermax. Defendants argue that because they were authorized to access the relevant computers when they took the actions alleged, they cannot be liable under CFAA. Plaintiffs argue that genuine issues of material fact exist as to whether the defendants were authorized to act as they did, rendering summary judgment inapt at this time.

It is a violation of section 1030(a)(4) of CFAA to:

> knowingly and with intent to defraud, access[] a protected computer without authorization, or exceed[] authorized access, and by means of

---

[206] Gillespie, 2007 WL 2480056, at *8.

[207] 18 U.S.C. § 1030.

[208] See Amended Complaint, at ¶¶ 195, 196, 198.

such conduct further[] the intended fraud and obtain[] anything of value
. . . .[209]

The term "exceeds authorized access," in turn, is defined in CFAA to mean, "to access a computer

with authorization and to use such access to obtain or alter information in the computer that the

accesser is not entitled to so obtain or alter."[210]

While several elements are necessary to sustain a claim under section 1030(a)(4),

Gleasman, Gresham and Sachdev base their Motion as to this section solely on a purported lack of

genuine fact issue around the element of authorization.[211]   The defendants argue that when they

accessed Purolite's computers in the manner at issue, they were neither without authorization nor

exceeding authorized access, as required for liability under section 1030(a)(4), since they were, at

the time, Purolite employees permitted to use their Purolite computers in this manner.   Plaintiffs

counter that because the defendants were not permitted to delete the files they deleted, and because

they accessed Purolite's computers with the purpose of defrauding Purolite, the access was not

authorized.   In part, the dispute raises a question of law.[212]

To a degree, the parties' positions mirror a split in the cases addressing the legal

meaning of "authorization" and "exceeds authorized access" in section 1030(a)(4).   Certain courts,

viewing these terms through the lens of agency law principles, have held that an employee is not

---

[209] 18 U.S.C. § 1030(a)(4).

[210] 18 U.S.C. § 1030(e)(6).

[211]   Because Defendants do not, at this juncture, contest the section 1030(a)(4) claim on any ground other than authorization, for purposes of the present analysis, the Court treats the remaining elements of a section 1030(a)(4) claim as established.

[212] Although it has discussed the general framework courts should use to analyze a section 1030(a)(4) claim, P.C. Yonkers, Inc. v. Celebrations: The Party and Seasonal Superstore, LLC, 428 F.3d 504, 508 (3d Cir 2005), the Third Circuit has not expressly addressed the meaning of the terms at issue here.

authorized to access an employer's computer in a manner inconsistent with the duty of loyalty to the employer, such that an employee can violate section 1030(a)(4) by accessing an employer's computer which he is generally permitted to use with a purpose to misappropriate or misuse the employer's proprietary information.[213] Other courts,[214] based on the language of CFAA,[215] its legislative history,[216] the rule of lenity in interpreting statutes with criminal or quasi-criminal applications,[217] and a compelling critique of the contrary line of cases,[218] have adopted the narrower view that these terms describe action that is "tantamount to trespass in a computer."[219] Under this view, an employee who may access a computer by the terms of his employment is "authorized" to use that computer for purposes of CFAA even if his purpose in doing so is to misuse or misappropriate the employer's information.[220] The Court is persuaded by the reasoning in the latter line of cases, and adopts the less capacious view of the legal meaning of "without authorization" and "exceeds authorized access" expressed therein.[221]

---

[213] See, e.g., Int'l Airport Ctrs., L.L.C. v. Citrin, 440 F.3d 418, 420-21 (7th Cir. 2006); Shurgard Storage Ctrs., Inc. v. Safeguard Self Storage, Inc., 119 F. Supp. 2d 1121, 1125 (W.D. Was. 2000).

[214] See, e.g., Shamrock Foods Co. v. Gast, 535 F. Supp. 2d 962, 963-968 (D. Ariz. 2008) (collecting cases); Brett Senior & Assocs., P.C. v. Fitzgerald, No. 06-1412, 2007 WL 2043377, at *3-*4 (E.D. Pa. July 13, 2007).

[215] See, e.g., Gast, 535 F. Supp. 2d at 965; Fitzgerald, 2007 WL 2043377, at *4.

[216] See, e.g., Gast, 535 F. Supp. 2d at 965-66; Fitzgerald, 2007 WL 2043377, at *3-*4.

[217] See, e.g., Gast, 535 F. Supp. 2d at 966-67; Fitzgerald, 2007 WL 2043377, at *4.

[218] Id.

[219] Fitzgerald, 2007 WL 2043377, at *3.

[220] See, e.g., id.; Gast, 535 F. Supp. 2d at 963-968 (collecting cases).

[221] Any inconsistency between this determination and a prior ruling touching on the meaning of "authorization" under CFAA, and that term's application to the conduct of Defendant Sachdev, may be explained by the developments in this area of law in the past two years, see, e.g., Gast, 535 F. Supp. 2d 962, 963-968 (collecting cases), which convince the Court that the proper view of the legal question presented is that adopted in this opinion.

Against the proper legal backdrop, a court's assessment of the quality or extent of a particular individual's authorization to access a computer is informed by the facts of the case. In the instant matter, genuine issues of material fact prevent summary judgment on the CFAA claims under section 1030(a)(4) against Gleasman, Gresham and Sachdev.

It appears that in the days and weeks around his or her leaving Purolite's employ, Gresham and Sachdev deleted some number of files and Purolite-related e-mails from his or her Purolite-owned computer. It further appears that Sachdev deleted files from Purolite's server. The nature of the files deleted by these former employees is contested. Purolite has put forth information indicating that departing employees were not permitted to delete business e-mails or business files from their work computers before returning such computers to the company.[222] A question of fact thus exists regarding whether Gresham and Sachdev deleted files or e-mails they were not permitted to delete – that is, whether they "altered information [they were] not entitled to alter,"[223] thereby exceeding their authorized access to their Purolite computers while still employed by the company.[224] This question is for the jury. It also appears that after leaving the company, Gleasman retained Purolite's computer for several weeks and accessed its contents, transferring some or all of them to a Thermax computer. Some of the information she transferred was allegedly proprietary customer

---

[222] Pls.' Facts Ex. 16 (September 5, 2007 Deposition of J. Brodie) 944; Defendant Sachdev also admitted that he was aware of such a rule or policy. Pls.' Facts ¶ 195. The fact that the deletions of Purolite files and emails alleged here were potentially made in violation of a company rule or policy regarding computer usage and prohibiting such deletions distinguishes this case from Fitzgerald, supra, in which it was established that the CFAA defendant had permission to obtain and alter all the information he was accused of misappropriating, obtaining or altering. 2007 WL 2043377, at *3.

[223] Fitzgerald, 2007 WL 2043377, at *3.

[224] As Plaintiffs note, if these defendants' deletions were not permitted, involved unique Purolite data and were irremediable, their conduct may also support a CFAA claim under section 1030(a)(5)(A)(i), which is predicated on unauthorized damage to a computer.

data.  There is, at the very least, a genuine issue of material fact as to whether she was authorized

to access Purolite's computer at this time in this fashion, which precludes summary judgment as to

the CFAA claim against her.  Because questions of fact exist regarding the nature and extent of

Gleasman's, Gresham's and Sachdev's authorization to alter or access the Purolite information they

allegedly accessed, summary judgment will be denied on Plaintiffs' CFAA claim.

### 3.  Plaintiffs' Misappropriation of Trade Secrets in Violation of PTSA Claim - Count I

Plaintiffs claim that each Defendant has violated the Pennsylvania Uniform Trade

Secrets Act ("PTSA") by misappropriating, retaining and misusing Purolite's trade secrets.[225]  They

seek relief in the form of compensatory and punitive damages, a preliminary and permanent

injunction barring Defendants from continuing to misappropriate, possess and use Purolite's

information, and other remedies available under the Act.

All Defendants, with the exception of Sachdev, have moved for either partial or total

summary judgment on this claim.  Gleasman, Gresham and Sabzali claim they are entitled to

summary judgment because the Purolite information they allegedly misappropriated did not qualify

as trade secret information under PTSA.  Mukhopadhyay, Pudumjee and Shastri contend there is no

legally sufficient evidence showing that any of them misappropriated Purolite trade secrets, such that

they should be granted summary judgment in full on this claim.

In contrast, Thermax seeks summary judgment on Plaintiffs' PTSA claim to a limited

extent.  Thermax does not oppose making permanent the preliminary injunction already in effect in

this matter, which essentially grants Purolite the injunctive relief it seeks under PTSA.  Regarding

damages, however, Thermax argues that summary judgment should be entered in its favor with

---

[225] 12 PA. CONS. STAT. ANN.  §§ 5301-08.

45

respect to any Purolite formula or process as to which actual or potential use by Thermax has not been alleged or shown in the relevant reports of Purolite's experts Golden and Klibanov. Thermax also seeks to limit or eliminate altogether Purolite damages based on loss of customers to Thermax due to Thermax's use of Purolite trade secrets, arguing that there is insufficient evidence that the alleged misappropriation caused Purolite's customer loss. Finally, Thermax argues that under PTSA, Purolite's ability to recover money damages for future use of the allegedly misappropriated secrets must be limited to exclude any period in which an injunction barring such use was in place in this matter. Thermax does not address the fact that in multiple motions for contempt it is formally accused of violating the injunction on which these arguments rely.

Under the Pennsylvania Uniform Trade Secrets Act, the term "Trade Secret" is defined to mean:

> Information, including a formula, . . . compilation including a customer list, . . . method, technique or process that:
> (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
> (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.[226]

Meanwhile, "Misappropriation," under the Act, is defined to include:

> (1) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
> (2) disclosure or use of a trade secret of another without express or implied consent by a person who:
> (i) used improper means to acquire knowledge of the trade secret;
> (ii) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:
> (A) derived from or through a person who had utilized improper

---

[226] 12 PA. CONS. STAT. ANN. § 5302.

means to acquire it;
>> (B) acquired under circumstances giving rise to a duty to
>> maintain its secrecy or limit its use; or
>> (C) derived from or through a person who owed a duty to the
>> person seeking relief to maintain its secrecy or limit its use .
>> . . .[227]

Finally, section 5308(a) of PTSA states, "except as provided in subsection (b), this chapter displaces conflicting tort, restitutionary and other law of this Commonwealth providing civil remedies for misappropriation of a trade secret," while subsection (b) of section 5308 states, "[t]his chapter does not affect: . . . (2) other civil remedies that are not based upon misappropriation of a trade secret."[228]

In ruling on Defendants' Motions for Summary Judgment on Plaintiffs' PTSA claim, the Court's threshold task is to determine whether Plaintiffs have put forth sufficient evidence to permit a reasonable jury to find that the information at issue as to each defendant qualifies for trade secret status. Plaintiffs allege that Defendants misappropriated trade secret information of two general types, technical IER production information, and customer and sales information. The Individual Thermax Defendants assert that there is no legally sufficient evidence demonstrating that any of them took any significant action with respect to Purolite trade secrets. Thermax does not seek summary judgment on the ground that the information it is accused of misappropriating cannot qualify as trade secrets, but rather seeks at this stage to limit its damages exposure on a theory of limited use or disclosure. Gleasman, Gresham, and Sabzali, however, argue that they should win summary judgment on this claim because the customer and sales information they allegedly misappropriated does not qualify for trade secret status, for either of two reasons. First, they claim

---

[227] Id.

[228] 12 PA. CONS. STAT. ANN. § 5308.

47

the information was not trade secret because it could be independently and readily obtained or was otherwise without value, and second, they claim it does not qualify because Purolite failed to adequately protect its secrecy.

When evaluating whether particular information merits trade secret status under Pennsylvania law a court may look to several factors, including: "(1) the extent to which it is known outside the owner's business; (2) the extent to which it is known by employees and others inside involved in the owner's business; (3) the measures taken by the owner to guard the secrecy of the information; (4) the value of the information to the owner and his competitors; (5) the amount of effort or money expended by the owner in developing the information; and (6) the ease or difficulty with which the information could be properly acquired by others."[229] A compilation of customer data may qualify as a trade secret if it is not readily obtainable from another source and was generated in such a fashion that it constitutes intellectual property of the owner.[230]  Customer data that goes beyond lists of customer names or mere prices charged to include "pricing formulae derived from a whole range of data relating to materials, labor, overhead and profit margin" falls into the protected category.[231]  Finally, client information that is not generally available which an employer supplies to an employee,[232] or which the employer – not the employee – has generated through expense, time,

---

[229] Fitzgerald, 2007 WL 2043377, at *6 (citing Iron Age Corp. v. Dvorak, 880 A.2d 657, 663 (Pa. Super. Ct. 2005)).

[230] See, e.g., AmerisourceBergen Drug Corp. v. American Associated Druggists, Inc., No. 05-5927, 2008 WL 248933, at *23-24 (E.D. Pa. Jan. 29, 2008); Fitzgerald, 2007 WL 2043377, at *6.

[231] AmerisourceBergen, 2008 WL 248933, at *24 (citing SI Handling Sys., Inc., v. Heisley, 753 F.2d 144, 1260 (3d Cir. 1985)).

[232] See Morgan's Home Equipment Corp. v. Martucci, 390 Pa. 618 (Pa. 1957).

and effort,[233] may qualify as trade secret information, but basic client information collected by the efforts of an employee during his employment will not.[234] Whether information qualifies for trade secret status is ordinarily a question of fact for the jury.[235]

A failure by the owner to employ reasonable security measures to safeguard its trade secrets can cause such information to lose its trade secret status.[236] Whether given security measures are reasonable is a question of fact to be evaluated in light of the circumstances and facts of the case.[237]

Here, at a minimum, a genuine issue of material fact exists as to whether the information Gleasman, Gresham and Sabzali took from Purolite to Thermax qualifies for trade secret status. The evidence shows that after leaving Purolite each of these defendants retained documents relating at least to customer communications, Purolite sales strategies and budgets, and product formulations, in some cases on Purolite letterhead and marked as confidential. For example, a genuine fact issue exists as to whether Purolite's 2005 Sales Forecast for the Southeastern United States, taken by Gresham in March of 2005, constitutes a trade secret. This document contained Purolite's projections for sales to specific customers in 2005, and identified the products Purolite anticipated selling to particular customers, their selling price, and Purolite's gross margin on such sales, among other information. Gresham, for one, believed the document to be confidential.

---

[233] See A.M. Skier Agency, Inc. v. Gold, 747 A.2d 936, 940 (Pa. Super. Ct. 2000) (client list including analysis of client needs and plaintiff's pricing methodology qualifies as trade secret).

[234] See Fidelity Fund, Inc. v. Di Santo, 500 A.2d 431, 434 (Pa. Super. Ct. 1985).

[235] See Project Dev. Group, Inc. v. O.H. Materials Corp., 766 F. Supp. 1348, 1355 (W.D. Pa. 1991).

[236] 12 PA. CONS. STAT. ANN. § 5302.

[237] See Ideal Aerosmith, Inc. v. Acutronic USA, Inc., Civ. No. 07-1029, 2007 WL 4394447, *2 (E.D. Pa. 2007).

Purolite, through the expert report of Frank Rudewicz, has shown enough to survive any charge at this stage that it failed to reasonably protect the confidential information it entrusted to Gresham. The 2005 Forecast appears to be the type of customer-oriented intellectual property "derived from a whole range of data relating to materials, labor, overhead and profit margin" that may qualify for trade secret protection. That question must be determined by the finder of fact at trial.

In a similar example, Gleasman retained a lengthy slide presentation apparently presented on or after October 28, 2004, which offers a detailed statement of Purolite's "Midwest Strategy for Growth" in certain "core" business areas.[238] The presentation explains Purolite's plan to engage particular customers, its expectations for revenue therefrom, and its steps taken to date. It is reasonable to infer that the plan reflected in the presentation was still operative in March, 2005, when Gleasman left Purolite for Thermax, bringing the presentation with her. There is a material dispute in the evidence as to what Purolite's expressed policy was with respect to an employee's obligation to return Purolite's proprietary information when departing the company. While Gleasman did not labor for Purolite under a contract, she may nonetheless have been subject to employment policies regarding information retention and return that would constitute adequate security measures in her employment context, precluding summary judgment for her on Count I.

Likewise, a jury must determine whether any of the materials taken by Sabzali warrant treatment as trade secret information. For one example, the PowerPoint presentation showing Purolite's strategy for entering the arsenic market, which Sabzali apparently modified to display the name "Thermax" in place of "Purolite," and then used in his functions at Thermax, well may qualify as a trade secret under Pennsylvania law. For another, it appears Sabzali shared the

---

[238] Pls.' Facts Ex. 146.

recipe for Purolite's water softening non-solvent cation with Shastri sometime after February 10, 2005, as reflected in an e-mail between Shastri and Mukhopadhyay from around that time. The jury must decide whether such product information qualifies as trade secret, as Purolite asserts. Again, Purolite has set forth enough evidence of reasonable security measures around the information taken by Sabzali to survive summary judgment over that charge.

In sum, because the Court finds that genuine issues of material fact exist as to whether the information Gleasman, Gresham and Sabzali took qualifies as trade secret information, they will not prevail on summary judgment on Count I.

Summary judgment will also be denied on Purolite's PTSA claim as to the Individual Thermax Defendants. Purolite has set forth evidence from which it could be reasonably inferred or concluded that each of these defendants was individually and instrumentally involved in the misappropriation of Purolite trade secrets by the Former Employee Defendants. For example, e-mail communications between Sachdev, Pudumjee and Mukhopadhyay regarding Sachdev's visits to Purolite plants in China and Europe during the final months of his recruitment by Thermax permit the inference that Sachdev was seeking to gather Purolite IER production information at Pudumjee's and Mukhopadhyay's behest for Thermax's benefit. Another e-mail shows Shastri discussing with Mukhopadhyay Purolite methods to keep its costs low when producing water softening cation resins and Purolite's shipping costs for products manufactured in China, both in detail. Such evidence could reasonably be interpreted as demonstrating that Pudumjee, Mukhopadhyay and Shastri unlawfully procured or used Purolite trade secrets in violation of PTSA.

Lastly, Purolite's PTSA claims will survive summary judgment in full and without limitation as to damages with respect to Thermax. There appears in the evidence at least a genuine

issue of material fact as to whether Thermax acquired Purolite trade secrets in violation of PTSA Section 5302(1). Thermax does not argue otherwise at this stage. Moreover, there is sufficient evidence showing use of numerous Purolite trade secrets by Thermax to survive summary judgment on a claim for violation of Section 5302(2) – a point also not seriously disputed by Thermax here. Thermax, however, seeks a ruling on summary judgment that Purolite is limited to seeking monetary damages only for those claims as to which it has already put forth specific evidence of actual commercial use by Thermax. The Court will decline to do so at this time. Genuine issues of fact appear as to the scope and nature of Thermax's use of the information at issue, whether actual or potential.[239] Rather than freeze now the matters on which Purolite may seek PTSA damages from Thermax despite the dispute over the rather extensive evidence of use which Purolite has set forth,[240] the Court will permit Thermax to put Purolite to its proof on this matter at trial. The Court also notes Purolite's assertion that a "reasonable royalty" measure of damages is appropriate herein, and superior to damages based on actual use and unjust enrichment due to the nature of the harm at issue.[241] The availability and measure of damages for any PTSA violation by Thermax may be

---

[239] Thermax and Purolite have set forth extensive and largely contradictory expert reports on this point, among others.

[240] Courts in this jurisdiction have long recognized that misappropriation and misuse of trade secrets "can rarely be proved by convincing direct evidence." Greenberg v. Croyon Plastics Co., Inc., 378 F. Supp. 806, 814 (E.D. Pa. 1974). Instead, plaintiffs in such matters may establish use or disclosure through inference, by showing that the defendant had access to plaintiff's trade secret, and that there are "substantial similarities" between defendant's product and plaintiff's secret information. See Scanvec Amiable Ltd. v. Chang, 80 Fed. Appx. 171, 179 (3d Cir. 2003) (citing Whelan Assocs. v. Jaslow Dental Lab., Inc., 797 F.2d 1222, 1231-32 (3d Cir. 1986)). The question of similarity is essentially one of fact, and is properly aided by expert and lay testimony at trial. Id.

[241] Damages in the form of a reasonable royalty are permitted under PTSA section 5304, "in lieu of damages measured by any other methods." 12 PA. CONS. STAT. ANN. § 5304(a).

established at a later point in this litigation, either when and if liability is proved, or otherwise.[242]

In accordance with the foregoing, Count I will survive summary as to all Defendants. However, due to the displacing effect of PTSA section 5308, if and when any Defendants are found at trial to have misappropriated Purolite trade secret information, Purolite's other tort or restitutionary claims against them will be preempted to the extent such claims are predicated on misappropriation of trade secrets as opposed to confidential or proprietary information of other sorts.

## 4. Plaintiffs' Claims for Breach of Contract - Count IV

In Count IV of the Amended Complaint, Plaintiffs claim that defendants Gresham, Sabzali and Sachdev breached their contracts with Purolite, which contained non-disclosure agreements, by disclosing that company's trade secret and other confidential information to Thermax. Gresham and Sabzali seek summary judgment on grounds of lack of breach and failure of Purolite to provide sufficient evidence of damages resulting from any contractual breach.

*a. Facts relevant to contract claim*

As noted, both Gresham and Sabzali worked for Purolite under a contract styled "Employee Patent and Trade Secret Agreement" ("EPTSA").[243] Their EPTSAs contained identical provisions regarding non-disclosure of "confidential information," defined to include "strategic plans, standard costs, sales, customer lists, marketing strategies and relationships . . . ."[244] Moreover, each EPTSA provides, "[e]mployee agrees that he will not disclose any such Confidential

---

[242] The issue is contested in Thermax's co-pending Motion to suppress the expert testimony of Purolite's damages expert.

[243] Pls.' Facts Ex. 8 (the EPTSAs of Sabzali and Gresham are attached as exhibits to the Rudewicz Report, which is Plaintiffs' Exhibit 8).

[244] Id.

Information to any unauthorized person or entity for any reason whatsoever while employed by [Purolite] or afterwards without the prior written agreement of the President of [Purolite]."[245]  In Gresham's executed EPTSA, portions of the document, including the words "or afterwards" from the non-disclosure provision, are crossed out and initialed.[246]

### b.  Discussion of Breach of Contract Claims

A breach of contract claim under Pennsylvania law requires a plaintiff to establish three elements: "(1) the existence of a contract, including its essential terms; (2) a breach of a duty imposed by the contract; and (3) resultant damages."[247]  The damages element may be satisfied at summary judgment by evidence from which damages are calculable "to a reasonable certainty."[248] This standard extends so far as to embrace "a rough calculation that is not 'too speculative, vague or contingent' upon some unknown factor."[249]  As a general matter, "the fundamental rule in interpreting the meaning of a contract is to ascertain and give effect to the intent of the contracting parties."[250]

Gresham argues that she did not breach her contract by disclosing any information that could be considered "confidential" by the terms of that document because any such disclosure occurred after she left Purolite's employ, and the provision in her EPTSA prohibiting disclosure of confidential information after leaving Purolite was deleted when the EPTSA was executed.  The

---

[245] Id.

[246] Id.

[247] CoreStates Bank, N.A. v. Cutillo, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999).

[248] ATACS Corp. v. Trans World Communications, Inc., 155 F.3d 659, 668 (3d Cir. 1998).

[249] Id. at 669 (quoting Spang & Co. v. United States Steel Corp., 545 A.2d 861, 866 (Pa. 1988)).

[250] Murphy v. Duqesne Univ. of the Holy Ghost, 777 A.2d 418, 429 (Pa. 2001).

evidence does not necessarily support Gresham's position.  It shows that Gresham transferred Purolite files, including files considered confidential, to a Thermax-owned computer on March 12 or 13, 2005, before leaving Purolite's employ. There is a genuine issue of material fact as to whether this act constitutes a "disclosure" to Thermax in violation of Purolite's EPTSA. As such, Gresham will not prevail on summary judgment on Count VI.

For purposes of the breach analysis, Sabzali's contract does not contain any relevant changes. Genuine fact issues have already been found as to whether Sabzali disclosed trade secret information to Thermax, thus permitting Purolite's PTSA claim against him to survive summary judgment. By the same token, Purolite has demonstrated acts in violation of Sabzali's EPTSA for present purposes, since that document prohibits disclosure to non-authorized entities of "confidential information" that surely includes trade secrets.

Sabzali seeks summary judgment on the ground that Purolite has failed to put forth sufficient evidence of cognizable damages from his alleged breach. This argument is rejected. Purolite has adduced evidence that Sabzali disclosed to Thermax a wide variety of Purolite proprietary information related to product formulation, manufacturing processes and costs, customer relationships and sales, both before and after he left Purolite.  As noted, there is, at a minimum, a genuine fact issue as to whether this information constitutes "confidential information" which Sabzali's EPTSA required him not to disclose. Purolite has set forth evidence that the information thus shared by Sabzali enabled Thermax to unfairly compete with Purolite with respect to a variety of customers and products, causing Purolite to suffer damages. Purolite has also adduced the expert report of a forensic economist who has endeavored to quantify the value of the damages Purolite suffered from the disclosure of its information and assuming liability on all of the causes of action

55

asserted herein, including Count IV.[251]  In light of this, the Court finds for present purposes that Purolite has demonstrated damages from Sabzali's purported contractual breach to a sufficient degree of certainty.  Like Gresham, Sabzali will be denied summary judgment as to Count IV.

## 5.  Plaintiffs' Claims for Breach of the Duty of Loyalty - Count V

Gleasman, Gresham and Sabzali move for summary judgment on Purolite's claim against them for breach of the duty of loyalty on the ground that there is not sufficient evidence that any of them acted in a manner that would satisfy the elements of that tort.

Pennsylvania law permits an agent or employee to "make arrangements to compete," but prohibits him from using "confidential information peculiar to his employer's business and acquired therein."[252]  Within this framework, an employee may properly inform customers of his current employer that he is leaving the employer to work elsewhere in the field, or to start his own competing business.[253]  In contrast, an employee who, while still working for her employer, makes improper use of her employer's trade secrets or confidential information, usurps a business opportunity from the employer, or, in preparing to work for a rival business, solicits customers for such rival business, may be liable for a breach of the duty of loyalty.[254]

A genuine issue of material fact exists as to whether Gleasman's March 17, 2005 e-mail to Purolite customer PSI Water, informing its purchasing representatives that she and Gresham were leaving the company, constitutes solicitation of PSI Water on behalf of Thermax and against

---

[251] This expert report is under determined attack by Thermax, but it has not been excluded.

[252] Spring Steels, Inc. v. Molloy, 400 Pa. 354, 162 A.2d 370, 375 (1960).

[253] See Cornerstone Sys., Inc. v. Knichel Logistics, L.P., 255 Fed. Appx. 660, 663 (3d Cir. 2007).

[254] Id. at 663-64; see also Fitzgerald, 2007 WL 2043377, at *8.

the interests of Purolite. The e-mail is conversational and devoid of express reference to products, prices, costs, delivery or other business or sales topics that might demonstrate solicitation. Yet, viewed in the light most favorable to Purolite, it implies that Gleasman would be making no further efforts to sell Purolite products to PSI Water and instead intended to service the customer's needs with her new employer's products after March 28, 2005. Whether this was a mere personal communication for the purpose of notification or an improper solicitation or usurpation of a business opportunity will be determined by the finder of fact at trial. Gleasman will be denied summary judgment respect to Count V.

Gresham will not prevail on her Motion as to Count V. Purolite has adduced evidence from which it could reasonably be concluded that she usurped Purolite business opportunities and thus breached her duty of loyalty to the company before leaving it on March 24, 2005. For example, a genuine fact issue exists as to whether she usurped a Purolite opportunity to sell certain IERs to Culligan in early March, 2005 when she received a request for pricing on Purolite products from a Culligan representative but declined to respond to for over two weeks, during which time she left Purolite and started working for Thermax. Her eventual response shows her attempting to sell Culligan Thermax products comparable to the Purolite products that had been inquired after weeks before. Plaintiffs have adduced evidence that Purolite lost sales to Culligan to Thermax once Gresham left Purolite. This episode could be reasonably understood as a usurpation in breach of Gresham's duty of loyalty to Purolite.[255]

---

[255] This episode contrasts with an episode on which Purolite places much weight. Purolite asserts that an e-mail in which Gresham, while still working for Purolite, asks for an analysis and sample of a Thermax product from Vivek Naik of Thermax demonstrates or permits a reasonable inference that Gresham solicited or sold Thermax products to two companies listed in the subject header of the e-mail, Donaldson and ABA Water. But this interpretation stretches Gresham's participation in the relevant e-mail string – to which she had been copied and a nonparticipant for several days before writing Naik – beyond reasonable limits. The e-mails do not permit an

Purolite's claim against Sabzali under Count V will survive summary judgment. The evidence arguably demonstrating Sabzali's breach of loyalty is rather significant, and includes the apparent disclosure of many types of Purolite confidential information before he left Purolite for Thermax. One example is the February 10, 2005 internal Thermax e-mail showing that Sabzali had described to Thermax's Vivek Naik how Thermax might seek to exploit Purolite's problems in supplying a particular anion resin to Purolite customer US Filter. Based on the evidence adduced, a genuine issue of material fact exists as to whether Sabzali breached his duty of loyalty to Purolite, and he will not be granted summary judgment on Count V.

## 6. Plaintiffs' Common Law Commercial Disparagement Claim - Count IX

Defendants Thermax and Gleasman move for summary judgment on Purolite's claim for common law commercial disparagement against each of them, arguing that there is an absence of genuine fact issue as to whether the accused communications were disparaging or caused damage to Purolite, among other grounds. Purolite bases Count IX as against Gleasman on negative statements it claims she made to Purolite customers after joining Thermax. These include the July 14, 2005 e-mail from Gleasman to the purchasing representative of Purolite customer Dynegy, urging him not to pay a Purolite invoice, stating that Thermax's "integrity, morals, business and personal ethics are so refreshing!!!!" as well as, "amazing what quality you can make when you manufacture with the correct % DVB and don't cut back on anything."[256] It bases its claim against Thermax on statements made by its agents Gleasman and Gresham to Purolite customer Culligan

---

inference that Gresham even communicated with the customers in question, let alone that she solicited them on Thermax's behalf or sold Thermax products to them prior to March 24, 2005.

[256] Pls.' Facts Ex. 106.

58

after March, 2005. As noted, Gleasman's and Gresham's alleged statements to Purolite customer Culligan stated or insinuated that Purolite mislabeled its China-made products as having been made in this country. The only evidence of these statements is the testimony of Jacob Brodie, who states that he heard about the statements second- or third-hand.

To prevail on a claim for commercial disparagement under Pennsylvania law, a plaintiff must show that the defendant published a statement about plaintiff's business to another, and: (1) the statement was false; (2) the publisher either intended the publication to cause pecuniary loss or reasonably should have recognized that publication would result in pecuniary loss; (3) pecuniary loss did in fact result; and, (4) the publisher either knew the statement was false or acted in reckless disregard of its truth or falsity.[257] As to the third element, "Pennsylvania law requires that a plaintiff claiming commercial disparagement plead damages with considerable specificity," by setting out in its complaint the names of the customers lost and financial loss resulting from the tort.[258] This requirement is relaxed where the disparagement claimed rises to the level of defamation *per se*, through publication which "imputes to another conduct, characteristics, or a condition that would adversely affect her in her lawful business or trade."[259] A plaintiff claiming defamation *per se* "need only prove 'general damages,' i.e., 'proof that one's reputation was actually affected by the slander, or that she suffered personal humiliation, or both.'"[260]

---

[257] Neurotron v. Medical Serv. Assoc. of Pa., Inc., 254 F.3d 444, 448-49 (3d Cir. 2001); Pro Golf Mfg., Inc. v. Tribune Review Newspaper Co., 570 Pa. 242, 246 (2002).

[258] Swift Bros. v. Swift & Sons, Inc., 921 F. Supp. 267, 276 (E.D. Pa. 1995) (citing Cosgrove Studio & Camera Shop v. Pane, 21 Pa. D. & C. 2d 89 (1960), rev'd on other grounds 408 Pa. 314 (1962)).

[259] Walker v. Grand Central Sanitation, Inc., 624 A.2d 237, 241 (Pa. Super. Ct. 1993); see also Franklin Prescriptions, Inc. v. New York Times Co., 424 F.3d 336, 343 (3d Cir. 2005).

[260] Franklin Prescriptions, 424 F.3d at 343 (quoting Walker, 634 A.2d at 242).

Purolite's commercial disparagement claims as to Gleasman and Thermax will not survive summary judgment. They do not survive on the basis of Gleasman's July 14, 2005 e-mail to the Dynegy representative because Purolite has not set forth any evidence regarding specific or general damages with respect to Dynegy. And they do not survive on the basis of Jacob Brodie's testimony about what he heard Gresham and Gleasman had said to a Culligan representative because this evidence is inadmissible hearsay. Summary judgment will be granted to Gleasman and Thermax on Count IX, which will be dismissed in its entirety.

## 7. Plaintiffs' Claim for Tortious Interference with Existing and Prospective Contractual and Business Relationships - Count VI

Purolite claims that Mukhopadhyay, Pudumjee, Shastri and Thermax tortiously interfered with Purolite's contracts of employment with Gleasman, Gresham, Sabzali and Sachdev, and that all Defendants wrongfully interfered with certain of Purolite's contractual and prospective business relationships, including Purolite's relationship with SolmeteX with respect to the product ArsenXnp.

Under Pennsylvania law, a claim for tortious interference with actual or prospective contractual or business relations entails four elements: "(1) the existence of a contractual or prospective contractual relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the absence of a privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct."[261]

---

[261] Synthes, 2007 WL 2043184, at *8 (citing Ride the Ducks of Phila., LLC v. Duck Boat Tours, Inc., 138 Fed. Appx. 431 (3d Cir. 2005) (citing Pelagatti v. Cohen, 536 A.2d 1337, 1343 (Pa. Super. 1987))).

The damage required under the fourth element may be established by reference to "the pecuniary loss of the benefits of the contract or the prospective relation; consequential losses for which the interference is a legal cause . . . or harm to reputation, if [it is] reasonably to be expected to result from the interference."[262]

Genuine issues of material fact preclude summary judgment on Count VI as to Thermax and the Individual Thermax Defendants. It could be reasonably inferred from the evidence that these Defendants purposefully interfered with Sabzali's and Sachdev's Purolite employment contracts while recruiting them in late 2004 and early 2005 by inducing them to disclose to Thermax confidential and proprietary Purolite information. As previously seen, each man's Purolite employment contract prohibited the disclosure of confidential company information to non-authorized outside entities. No privilege to induce Sabzali or Sachdev to breach their contracts in this fashion appears to have existed. Purolite has adduced evidence that attempts to capture the measure of damages from the loss of its confidential information, such that there is at least a genuine fact issue around the element of damages from the alleged interference.

Count VI as to Defendant Sabzali will also survive summary judgment. One basis for this ruling is Sabzali's apparently instrumental role in the allegedly unlawful aspects of the recruitment of Sachdev. Also, there is a genuine issue of material fact as to whether Sabzali purposefully interfered with Purolite's exclusive contractual relationship with SolmeteX by convincing the company to breach the exclusive contract in the summer of 2005 in favor of a deal with Thermax. There is evidence of record suggesting legal damages from the interference, that is, evidence that Purolite's contract with SolmeteX was suspended for a period of several months while

---

[262] <u>Pawlowski v. Smorto</u>, 588 A.2d 36, 40 (Pa. Super. 1991).

Thermax's approach, effectuated through Sabzali, was considered.

Similarly, Gresham will be denied summary judgment on Count VI. The evidentiary basis for the denial is the same as that supporting the denial of Gresham's Motion as to Purolite's Breach of the Duty of Loyalty claim, and is not re-stated here.

However, the Court will grant summary judgment on Count V as to Gleasman and Sachdev. Purolite provides no evidence that Sachdev purposefully interfered with any contract at all. And with respect to Gleasman, Purolite has failed to set forth evidence of specific contracts or business relationships she affected or damages related to alleged acts of interference. With respect to all other Defendants, summary judgment will be denied on this Count.

## 8. Plaintiffs' Claim for Common Law Unfair Competition (Count III)

Against all Defendants, Purolite brings claims under the Pennsylvania common law of unfair competition. All Defendants move for summary judgment on the claims.

In Pennsylvania, the common law tort of unfair competition takes its definition from the Restatement (Third) of Unfair Competition, § 1(a),[263] which provides, in relevant part:

> One who causes harm to the commercial relations of another by engaging in a business or trade is not subject to liability to the other for such harm unless ... the harm results from ... acts or practices of the actor determined to be actionable as an unfair method of competition, taking into account the nature of the conduct and its likely effect on both the person seeking relief and the public.[264]

Comment (g) to Section 1(a) explains that competition in business through improper use of another's confidential information may qualify as unfair competition "even if the conduct is not specifically

---

[263] See Synthes, 2007 WL 2043184, at *9.

[264] Restatement (Third) Unfair Competition § 1(a).

62

actionable under the rules relating to . . . misappropriation of trade secrets."[265] Thus the tort of unfair competition has been found to encompass ". . . misrepresentation, tortious interference with contract, improper inducement of another's employees, and unlawful use of confidential information."[266]

Purolite's claims of Unfair Competition under Count III as to all Defendants will survive summary judgment.  Plaintiffs have adduced sufficient evidence to create a genuine issue of material fact around whether the Individual Thermax Defendants knowingly participated in a scheme with the Former Employee Defendants to misappropriate Purolite's proprietary business information for the benefit of Thermax.  While this claim would be preempted under Section 5308 of PTSA to the extent the information at issue is determined to be trade secret information, the claim may otherwise rest on confidential information which does qualify for such status.[267] A conclusive determination as to whether the information allegedly misappropriated by Defendants qualifies for trade secret status has not been made; rather, the Court has ruled that sufficient evidence on the question appears for Purolite's claim to withstand the Motions for summary judgment.  It may happen at trial that some or all of this information is found not to be trade secret information, but nonetheless confidential and proprietary in nature.[268] For now, therefore, Count III survives outright.

### 9. Civil Conspiracy (Count XIII)

Purolite sues all Defendants for civil conspiracy.  All Defendants move for summary

---

[265] Id., cmt. (g); see also Synthes, 2007 WL 2043184, at *9.

[266] Synthes, 2007 WL 2043184, at *9.

[267] See id.

[268] Cf. Fitzgerald, 2007 WL 2043377, at *7-*8; Cenveo Corp. v. Slater, No. 06-cv-2632, 2007 WL 527720, at *4 (E.D. Pa. Feb 12, 2007) ("it should not be assumed that the Pennsylvania legislature's enactment of the PTSA was intended to abrogate common law . . . claims based on the taking of information that, though not a trade secret, was nonetheless of value to the claimant").

judgment on the claims.

Claims for civil conspiracy under Pennsylvania common law must be based upon an independent underlying civil cause of action. To prevail on a civil conspiracy claim, a plaintiff must show "(1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage."[269] Such claims must be based on a free-standing cause of action, and "may be proved by acts and circumstances sufficient to warrant an inference that the unlawful combination had been in point of fact formed for the purpose" alleged.[270] Also necessary to a civil conspiracy claim is proof that the alleged conspiracy acted with the intent to injure the plaintiff – in other words, malice.[271] It must be shown "that the '*sole* purpose of the conspiracy was to injure the plaintiffs.'"[272] This necessary proposition is negated by a showing that the acts alleged were done for professional or business benefit.[273]

Plaintiffs' case is built on the theory that Defendants acted for their business advantage and benefit. Plaintiffs have adduced significant evidence to show as much, and many

---

[269] Gen. Refractories v. Fireman's Fund Ins. Co., 337 F.3d 297, 313 (3d Cir. 2003).

[270] Scully v. U.S. WATS, Inc., 238 F.3d 497, 516 (3d Cir. 2001).

[271] Thompson Coal Co. v. Pike Coal Co., 412 A.2d 466, 472 (Pa. 1979).

[272] Morilus v. Countrywide Home Loans, Inc., No. 07-900, 2008 WL 5377627, at *16 (E.D. Pa. Dec. 22, 2008) (quoting Spitzer v. Abdelhak, No. 98-6475, 1999 WL 12044352, at *9 (E.D. Pa. Dec. 15, 1999)) (emphasis in original); see also American Independent Ins. Co. v. Lederman, No. 97-4153, 2000 WL 1209371, at *20 ("Malice, the intent to injure and a lack of justification for this intent, are essential parts of a civil conspiracy cause of action") (citations omitted).

[273] See e.g. Spitzer, 1999 WL 12044352, at *9 (finding absence of malice and dismissing civil conspiracy claim where "Defendants' purpose of the conspiracy was to benefit themselves personally and professionally. The fact that it may have been necessary to deceive Plaintiffs in order to carry out their scheme in no way indicates that they acted with malice solely to injure Plaintiffs").

claims based on this theory survive for trial.  One consequence of this approach is that a civil conspiracy claim is not now tenable because Plaintiffs' evidence belies the notion that Defendants acted without a business motive, but purely out of malice.  As Defendants have demonstrated that there is no genuine issue of material fact as to this point, Count XIII will be dismissed in its entirety.

## 10.  Unjust Enrichment (Count X) and Vicarious Liability (Count XIV)

Purolite's unjust enrichment claim against Thermax will survive summary judgment.  The elements of unjust enrichment in Pennsylvania are: "(1) benefits conferred on one party by another; (2) appreciation of such benefits by the recipient; and (3) acceptance and retention of these benefits in such circumstances that it would be inequitable for the recipient to retain the benefits without payment of value."[274]  Genuine issues of material fact exist as to whether Thermax accepted and retained Purolite proprietary confidential information other than information that would qualify for trade secret status under PTSA.[275]  Purolite will be permitted to make its case at trial that Thermax did receive and retain such confidential information through misappropriation by the former Purolite employee defendants, such that equity requires a remedy of payment of value.

Purolite's vicarious liability claim against Thermax will likewise survive summary judgment.  In Pennsylvania an employer may be vicariously liable for intentional acts of an employee "committed during the course of and within the scope of the [employee's] employment."[276]  As relevant here, the acts in question must be similar in kind to what the employee is employed to do, must occur substantially within the employment context, and must be "actuated by a purpose to serve

---

[274] Kraus Indus., Inc. v. Moore, No. 06-542, 2007 WL 2744194, at *8 (W.D. Pa. Sept. 18, 2007) (citing Lauren W. ex. Rel. Jean W. v. Deflaminis, 480 F.3d 259, 277 (3d Cir 2007)).

[275] See Youtie v. Macy's Retail Holding, Inc., 626 F. Supp. 2d 511, 521-22 (E.D. Pa. 2009).

[276] Fitzgerald v. McCutcheon, 410 A.2d 1270, 1271 (Pa. Super. Ct. 1979).

the master."[277] In light of the previous rulings on Defendants' Motions, a genuine issue of material fact exists as to whether any individually named Defendant committed an intentional act in furtherance of Thermax's interests within the scope of his or her employment and on which a cause for vicarious liability against Thermax could rest. Count XIV will not be dismissed.

### B. Summary Judgment as to Defendant's Affirmative Defense of Unclean Hands

In its Answer to Purolite's Amended Complaint, Thermax asserted several affirmative defenses and Counterclaims. By Memorandum and Order of March 19, 2009 this Court dismissed Thermax's Counterclaims as withdrawn. Over two years earlier, Purolite had moved for summary judgment on these Counterclaims as well as on two of Thermax's affirmative defenses, those of failure to mitigate and unclean hands. By Order of March 31, 2009 the Court dismissed Purolite's Motion for summary judgment in its entirety, as moot. In dismissing Purolite's Motion with respect to Thermax's affirmative defenses, the March 31, 2009 Order swept too broadly. The dismissal of Thermax's Counterclaims rendered Purolite's summary judgment Motion moot with respect to those Counterclaims only. Accordingly, the Court will hereby vacate the March 31, 2009 Order dismissing Purolite's Motion for summary judgment insofar as that Order affected Purolite's request for judgment on Thermax's affirmative defenses, and Purolite's Motion as to the defenses of failure to mitigate and unclean hands will be reinstated.

As noted previously, Thermax has withdrawn the affirmative defense of failure to mitigate, and it will be dismissed. Purolite's Motion for summary judgment thus addresses one defense only, the equitable defense of unclean hands. Thermax asserts the defense to the extent that

---

[277] Schloss v. Sears Roebuck and Co., No. 04-2423, 2005 WL 433316, at *2 (E.D. Pa. Feb. 24, 2005) (quoting RESTATEMENT (SECOND) OF AGENCY § 228 (1958)).

Purolite seeks relief in equity on any claim.

Thermax correctly notes that a party seeking judicial relief in equity must "show that not only has he a good and meritorious cause of action, but he must come into the court with clean hands."[278] Yet the equitable defense of unclean hands is rather exacting in the proof it requires:

> [T]he primary principle guiding the application of the unclean hands doctrine is that the alleged inequitable conduct must be connected, *i.e.* have a relationship, to the matters before the court for resolution. We will not refuse relief to a party merely because it has engaged in misconduct which is unrelated to claims before the court. Only when some unconscionable act of one coming before the court has immediate and necessary relation to the equity that the party seeks, will the doctrine bar recovery.[279]

Thus, the defense is not available when the conduct alleged to justify its application does not relate directly to the action at bar, and does not affect the relationship between the parties.[280]

Thermax contends that in the past Purolite engaged in conduct similar to what it now accuses Thermax of doing.  Thermax identifies three individuals whom Purolite hired after they worked at competing IER manufacturers.  It claims that after hiring them, Purolite mined these individuals for proprietary information belonging to their respective former employers.  One was hired in 1995, one in 1997, and one in March of 2003.  Thermax has not adduced evidence showing that, despite this obvious temporal distance, these incidents have an "immediate and necessary" relation to the events and issues in dispute in this case.  Purolite will be granted summary judgment on Thermax's ninth affirmative defense, unclean hands, which will be dismissed.

---

[278] Salomon Smith Barney v. Vockel, 137 F. Supp. 2d 599, 603 (E.D. Pa. 2000).

[279] New Valley Corp. v. Corporate Property Assoc. 2 & 3, 181 F.3d 517, 525-27 (3d Cir. 1999).

[280] RCN Telecom Servs., Inc. v. DeLuca Enterprises, Inc., 413 F. Supp. 2d 464, 475 (E.D. Pa. 2005); Mudd v. Nosker Lumber, Inc., 662 A.2d 660, 663-64 (Pa. Super. Ct. 1995).

## V. CONCLUSION

In accordance with the foregoing, upon Defendants' Motions for summary judgment and with respect to Purolite's Amended Complaint, the Court will <u>dismiss</u> the following Counts and/or claims: Count II (Inevitable Disclosure) in its entirety;  Count IV (Breach of Contract) as to Defendant Gleasman only;   Count VI (Tortious Interference with Existing and Prospective Contractual and Business Relations) as to Defendants Gleasman and Sachdev only;   Count VII (Conversion) in its entirety;  Count IX (Common Law Commercial Disparagement) in its entirety; Count XI (Violation of 18 U.S.C. § 1962(c)) in its entirety;  Count XII (Violation of 18 U.S.C. § 1962(d)) in its entirety; and,  Count XIII (Civil Conspiracy) in its entirety.

Defendants' Motions are otherwise denied, such that the following Counts and/or claims <u>remain in issue</u>: Count I (Misappropriation of Trade Secrets in Violation of 12 Pa. Cons. Stat. Ann. §§ 5308 <u>et seq.</u>) as against all Defendants; Count III (Common Law Unfair Competition) as against all Defendants; Count IV (Breach of Contract) as against Defendants Gresham, Sabzali and Sachdev only;  Count V (Breach of the Duty of Loyalty) as against Defendants Gleasman, Gresham, Sabzali and Sachdev;  Count VI (Tortious Interference with Existing and Prospective Contractual and Business Relations) as against Defendants Gresham, Mukhopadhyay, Pudumjee, Sabzali, Shastri, and Thermax only; Count VIII (Violation of 18 U.S.C. § 1030 <u>et seq.</u>) as against Defendants Gleasman, Gresham, and Sachdev; Count X (Unjust Enrichment) as against Thermax; Count XIV (Vicarious Liability and Respondeat Superior) as against Thermax; and, Count XV (Permanent Injunction) as against all Defendants.

In addition, the Court will vacate its prior Order to the extent that such Order effectuated the dismissal of Purolite's Motion for summary judgment as to Thermax's eighth and

ninth affirmative defenses.  Purolite's Motion is reinstated insofar as it relates to these defenses. Upon consideration of Purolite's Motion, the Court will <u>dismiss</u> Thermax's eighth affirmative defense (Failure to Mitigate) and its ninth affirmative defense (Unclean Hands).

An appropriate Order follows.